# Neal D. Ivey Company, Appellant, *v.* Franklin Associates, Inc.

Argued November 20, 1951.   Before Drew, C. J., Stern, Stearne, Ladner and Chidsey, JJ.

reargument refused May 7, 1952.

*George V. Strong,* with him *Strong, Sullivan, Saylor and Ferguson,* for appellant.

*David S. Malis,* with him *Malis, Malis & Malis,* for appellees.

OPINION BY MR. JUSTICE CHIDSEY, March 24, 1952:

Neal D. Ivey Company, appellant, filed a bill of complaint against Franklin Associates, Inc. and House-of-Charm Fabrics, Inc., appellees, for injunction and accounting. The proceeding was based upon a contract whereby Ivey was to conduct an advertising campaign for Franklin, payment therefor to be made out of gross proceeds of sales of Franklin's products. Ivey claimed monies were due to it under its construction of the contract between the parties. Franklin and House-of-Charm filed an answer setting up a different construction of the contract and denying liability. After hearing, the chancellor rejected Ivey's interpretation of the contract and dismissed the bill. Upon Ivey's exceptions the court *en banc* made an order directing an accounting, to be based, however, upon the construction placed upon the contract by the chancellor, Judge PARRY dissenting. Ivey excepted to this order. Franklin then filed an account and a supplemental account, to which accounting Ivey filed exceptions. During the course of the proceedings Ivey petitioned for examination of Franklin's records relating to a certain account known as the "1318 account". After answer to the petition and testimony taken, the rule issued was made absolute. Either by stipulation or in course all testimony

and evidence adduced in the case was before the court in passing on and dismissing plaintiff-Ivey's exceptions to the findings of fact, rulings and order of the auditing judge sur exceptions to defendant-Franklin's accounts. This appeal is from the court's final decree dismissing the bill.

Ivey, a corporation, is an advertising agency. Franklin, a corporation, manufactures and sells slip covers for furniture, draperies and other fabrics. House-of-Charm, a corporation, throughout the transactions here involved acted as a selling agency for Franklin. On August 8, 1947 Ivey and Franklin entered into a written contract under which Ivey was to plan and place in magazines and newspapers mail order advertising for Franklin's slip covers and draperies for the period of one year. Ivey was to advance the money for advertising costs, to be reimbursed therefor and also paid compensation for its services from gross proceeds of the sales, excluding therefrom return sales not exceeding 5% of the total sales resulting from the advertising. Franklin gave Ivey the exclusive right to place the advertisements (the extent and frequency of the advertising to be mutually agreed upon) and the slip covers and draperies were to be sold under the House-of-Charm trade name.

Paragraph 4 of the contract, out of which the issues in controversy principally arise, reads as follows: "4. In order that Party of the First Part [Ivey] may be reimbursed for the cost of advertising placed by it and be compensated for its services in planning and placing such advertising and for advancing all advertising costs, Party of the Second Part [Franklin] agrees to pay to Party of the First Part all the gross proceeds of sales *resulting from each advertisement,* as received, until the amount so paid by Party of the Second Part to Party of the First Part shall equal the amount of the published rate card of such advertise-

ment. *Thereafter,* Party of the Second Part shall pay to Party of the First Part such amounts as together with any amount previously paid from the proceeds of sales resulting *from such advertisement* shall equal Thirty Per Cent. (30%) of the gross proceeds of all sales (as defined in the Third Whereas clause on page one hereof) to date resulting *from such advertisement;* it being the intention of the parties hereto that the total amount to be paid by Party of the Second Part to Party of the First Part by way of reimbursement and compensation *for each and every such advertisement* shall be Thirty Per Cent. (30%) of such gross proceeds of sales resulting from that particular advertisement. *After Party of the Second Part has paid to Party of the First Part the actual cost of each advertisement as above stated, all further* accounting and payments to Party of the First Part shall be made by Party of the Second Part at the end of each calendar month, or within five (5) days thereafter. For the purpose of defining the obligations of Party of the Second Part hereunder, *each advertising insertion* placed by Party of the First Part *shall be considered a unit* to the extent that the obligation of Party of the Second Part arising with respect to each such unit shall be distinct and shall not be affected by its obligation with respect to any other such unit. The sales of curtains purchased for resale by Party of the Second Part shall not be included in the computation of gross sales." (Emphasis supplied)

Franklin's contention, adopted by the chancellor and approved by the majority of the court below, was, that Ivey was to receive 30% of the proceeds of sales and no more under any circumstances. Ivey contended in the court below and contends here that under the contract, and especially paragraph 4 above set forth, the proceeds of sales resulting from the advertising must be paid and divided as follows: (1) All the pro-

ceeds of sales resulting from each advertisement must be paid Ivey by Franklin *until* the amounts so paid Ivey shall equal the publications' charge (or the published rate card) for such advertisement; (2) all additional proceeds of sales from each such advertisement shall be retained by Franklin *until* the amount theretofore paid Ivey shall equal 30% of the total or sum of the amount paid Ivey and the amount retained by Franklin; (3) further proceeds of sales from each such advertisement must be divided 30% to Ivey and 70% to Franklin. Thus if the charge of the publication for an advertisement paid by Ivey amounted to $3,000, Franklin would be obliged to pay Ivey the proceeds of sales resulting from the advertisement until Ivey received $3,000. Franklin would retain the proceeds of further sales to the extent of $7,000. If the proceeds of sales reached a sum in excess of $10,000, all of the excess would be divided 30-70. Ivey would be reimbursed for the advertising and receive no more than 30% of the gross sales. But if the proceeds of sales resulting from an advertisement were less than the cost of advertising (which was true to a substantial extent in the present case) then under Franklin's construction adopted by the chancellor, Ivey would receive only 30% of an amount in itself less than the cost of the advertisement.

We are of the opinion that the agreement plainly calls for the construction claimed by the plaintiff Ivey. The chancellor whose conclusion was adopted by the lower court, ignores the provision contained in the first sentence of paragraph 4 of the agreement that "... Party of the Second Part [Franklin] agrees to pay to Party of the First Part [Ivey] all of the gross proceeds of sales resulting from each advertisement, as received, until the amount so paid by Party of the Second Part to Party of the First Part shall equal the amount of the published rate card of such advertisement", the

chancellor then in effect deletes the word "Thereafter" at the beginning of the sentence immediately following, and thereupon takes from its context and relies upon the participial clause which reads ". . . it being the intention of the parties hereto that the total amount to be paid by Party of the Second Part to Party of the First Part by way of reimbursement and compensation for each and every such advertisement shall be Thirty Per Cent. (30%) of such gross proceeds of sales resulting from that particular advertisement." But this clause is a part of and belongs to the sentence to which it is added and the sentence refers to what occurs *after* Ivey has been paid from the gross proceeds of sales resulting from a particular advertisement the amount of the published rate card of such advertisement. Such reliance upon the participial clause requires that it be lifted from the sentence to which it is attached with the effect of annulling not only the body of the sentence but the preceding and subsequent sentences. The sentence immediately following reads: *"After Party of the Second Part has paid to Party of the First Part the actual cost of each advertisement as above stated, all further* accounting and payments to Party of the First Part shall be made by Party of the Second Part at the end of each calendar month, or within five (5) days thereafter."* (Emphasis supplied) The next sentence provides that in defining the obligations of Franklin ". . . each advertising insertion . . . shall be considered a unit . . ." distinct from and not affected by Franklin's obligation ". . . with respect to any other such unit." Under the chancellor's construction this sentence is rendered meaningless.

It is a rule of universal application that in construing a contract each and every part of it must be taken into consideration and given effect if possible, and that the intention of the parties must be ascertained from the entire instrument. An interpretation will not be

given to one part of a contract which will annul another part of it: *Harrity v. Continental-Equitable Title & Trust Co.,* 280 Pa. 237, 124 A. 493; *Nusbaum v. Hartford Fire Ins. Co.,* 276 Pa. 526, 120 A. 481; *Tustin v. Philadelphia & Reading Coal & Iron Company,* 250 Pa. 425, 95 A. 595; *Morris v. American Liability & Surety Company,* 322 Pa. 91, 185 A. 201; 12 Am. Jur. §241, p. 772; 17 C. J. S. §297, p. 707.

Defendant-Franklin and the chancellor placed some reliance upon the preliminary recital of the contract which in one "Whereas" clause referred generally to Ivey's compensation as being 30% of the gross proceeds of sales, but a subsequent "Whereas" clause recited that Ivey consented to the proposals of Franklin "on the terms and conditions hereinafter stated." The specific terms in the body of the contract control: See *First National Bank of East Conemaugh, to use v. Davies,* 315 Pa. 59, 172 A. 296; *Philadelphia v. Philadelphia Transportation Company,* 345 Pa. 244, 26 A. 2d 909.

It appears from the record that three successive billings by Ivey paid by Franklin at the beginning of the contractual relationship were in accord with Ivey's construction of the contract but since we are of opinion that the contract speaks for itself, resort to course of conduct by the parties is not necessary as an aid in its interpretation.

Pursuant to the contract two advertising campaigns were conducted, one in the fall of 1947 and the other in the spring of 1948. In the course of the fall of 1947 campaign, at Franklin's request Ivey permitted Franklin to sell under the name "House-of-Charm" by direct mail solicitation the same slip covers and draperies which Ivey advertised, along with other Franklin products. This independent venture by Franklin in which Ivey had no financial interest, covered former custom-

ers of Franklin and persons on mail order lists. In each advertisement placed by Ivey under the contract between the parties there appeared an order coupon for use by the prospective customer containing the address House-of-Charm, Box 358, Philadelphia. Ivey had access to this box and collected all orders, accompanying checks and inquiries, listed them according to publications, and then forwarded them and the listing to Franklin. When Franklin undertook its independent direct-by-mail campaign, it obtained through Ivey 25,-000 reprints of an advertisement published in the course of the fall of 1947 campaign. These reprints showed the address of the advertiser as P.O. Box 358, but Franklin by overstamping changed the address of the advertiser to P.O. Box 1318. Ivey did not have access to this box. When Franklin shipped slip covers and draperies to a customer obtained through the Ivey advertising, it enclosed these reprints, and repeat orders of purchases originally made because of the Ivey advertising would go to Box 1318.

In the course of their audit of Franklin's account of the Ivey fall of 1947 campaign, Ivey's accountants examined the "sales orders" prepared by Franklin and produced by it as the sales orders resulting from such campaign. Included in the sales orders produced were approximately 200 sales orders marked "1318". These "1318" sales orders showed proceeds of sales aggregating $4,598.54. None of the proceeds of the sales shown by such "1318" orders had been included in Franklin's accounts of the Ivey fall of 1947 advertising campaign and an analysis showed that a substantial percentage of such sales had been made to customers developed by Ivey's campaign making inquiries as to advertised merchandise and to customers developed by Ivey's campaign who made reorders after receiving delivery of the goods originally ordered. After the taking of testimony

this was admitted by Franklin and so found by the court.

Having thus found that a substantial number of sales orders of sales made by Franklin to customers developed by Ivey in the fall of 1947 campaign of slip covers and draperies advertised by Ivey in such campaign, had been marked "1318" and that none of the proceeds of such sales had been included in the proceeds of sales of the fall of 1947 campaign for which Franklin accounted but that all such proceeds had apparently been credited to Franklin's own "1318" account, Ivey desired to examine all the books and records of Franklin's "1318" account. The right to so examine the books and records of Franklin relating to sales of slip covers and draperies under the House-of-Charm name was expressly given in paragraph 6 of the contract. In the course of their original audit Ivey's accountants therefore requested permission to examine the books and records of this "1318" account but Franklin refused the request. The same request was made after the conclusion of the audit, but Franklin by letter again refused the request. Ivey then obtained a rule to examine the books and records of Franklin's "1318" account which, after depositions and argument, the court made absolute. However, when Ivey's accountants sought to examine these particular books and records, Franklin only produced a cash receipts and disbursement book showing merely lump receipts and charges and 7 sales orders pertaining to the "1318" account. Failure to produce the essential records was blamed on a fire which occurred some two months after Franklin filed its answer to the rule. Ivey's accountants therefore could not determine the names of customers to whom goods had been sold or the kind of goods which had been sold in "1318" transactions except as to the 200 sales orders which they had previously examined.

As above stated, the 200 sales orders marked "1318" showed proceeds of sales aggregating $4,598.54. The "1318" account contained gross sales of $14,363.69 and returns of $2,493.82, or net sales of $11,869.87. Franklin admitted and the court found that Ivey was entitled to $933.42 as representing Ivey's 30% commission on that portion of the $4,598.54 which represented repeat sales and inquiry sales obtained through Ivey advertising, but refused Ivey's claim that under the circumstances Franklin should be charged with that proportion of all the gross proceeds of sales in the "1318" account which the total amount of the proceeds of sales of slip covers to Ivey customers shown by the 200 sales orders bears to the total amount of the proceeds of sales shown by such 200 sales orders. We are of opinion that this claim by Ivey should have been allowed. Franklin did not act in good faith, indeed violated the contract providing for the desired examination of its records in the "1318" account. If Ivey's proper requests for examination had been complied with, such examination could have been made before the fire occurred. Since Franklin refused access to the records in question, it is a fair assumption that an examination of all the sales orders and accompanying data totalling net sales of $11,869.87 contained additional sales in substantial amount properly accreditable to the Ivey advertising and Franklin should not benefit by its own default. Franklin prevented the exact determination of the amount thereof and the admitted proportion of sales due to Ivey advertising in the 200 sales orders totalling $4,598.54 established a sufficient base under the circumstances for an estimate of reasonable certainty as to the amount of sales due to Ivey advertising contained in the balance of $7,271.33 net sales shown in the "1318" account. See *Newcomer, Admrx., v. South Fayette Coke Company,* 317 Pa. 108, 176 A. 228; *Commonwealth Trust Company of Pittsburgh v.*

*Hachmeister Lind Company*, 320 Pa. 233, 181 A. 787. " 'Substantial justice is better than exact injustice.' ": *Osterling v. Frick et al., Executors*, 284 Pa. 397, 131 A. 250.

The lower court refers to the opportunities to audit and the actual auditing made by Ivey of Franklin's accounts with the latter's permission. Ivey does not claim that it was not given full access to Franklin's records with respect to the Ivey account, but complains that in the course of the examination of the Ivey account and discovery of the "1318" sales orders Franklin refused examination of the "1318" account. In Ivey's petition for the rule to examine the books and records in the "1318" account it is averred in paragraph 13, "In the course of said audit plaintiff's said accountants requested permission to examine the said '1318 Account' and the records, orders and correspondence of the sales included therein, but such permission was refused by defendants." Defendants' answer to this paragraph is: "Admitted. 'Ivey' has no right to examine other books and records not related to the sales produced as a result of 'Ivey's' advertising." Since the auditing judge granted the rule, it is evident that he deemed Ivey entitled to the examination of the books and records bearing on the "1318" account. This is in contradiction of the general conclusion reached by the auditing judge, above stated, that Ivey had sufficient access to Franklin's books. Under all the circumstances we are of opinion that in fairness and equity Franklin was properly chargeable with that proportion of all the gross proceeds of sales in Franklin's "1318" account which the total amount of the proceeds of sales of slip covers and draperies to Ivey customers shown by the 200 available sales orders bears to the total amount of the proceeds of sales shown by such 200 sales orders.

Under the contract Ivey was to receive (subject to the provision with respect to reimbursement of the cost of advertising hereinbefore discussed) 30% of the amount of the gross proceeds of any and all sales, excluding therefrom return sales not exceeding 5% of the total sales resulting from the advertising. A substantial number of return sales was to be anticipated in a mail order business of this character. During the taking of testimony sur plaintiff's exceptions to Franklin's account, Franklin's counsel stated, "You know, when you deal with mail order, if people complain to the Post Office Department, our business could be shut up if the thing is not right, so that in every case the customer was right. If they wouldn't accept it, or did not want it, or had any kick, they got the money back." The average cost of the articles sold was $25.00. The court commented during the taking of testimony on this subject matter, "It would be ridiculous to litigate each one of these little cases in that fashion . . . To have a law suit for $25.00 with people throughout the whole country could be ridiculous." Obviously the parties to the agreement fixed upon an arbitrary amount of allowance for return sales, namely, 5%. Ivey would therefore be entitled to its 30% of the amount by which the monies returned to purchasers exceeded 5% of the gross proceeds of sales received by Franklin.

Franklin's accounting showed gross proceeds from sales in round figures of $148,000 and monies returned to customers ". . . by reason of cancellations, rejections because of color, requests for special orders and returns," somewhat over $27,000. This left total net receipts of about $120,000 on which amount Franklin based and paid 30% to Ivey. Ivey claimed that of the deductions in the amount of $27,000 there were return sales in excess of the 5% limitation and as to which Ivey was entitled to its commission percentage. It was admitted that refunds in the amount of somewhat over

$27,000 had actually been made by Franklin. The question arose what portion of the refunds represented "return sales". Ivey conceded that a sale did not occur where an order was cancelled, where an order did not cover the chair or couch design portrayed in the advertisement or where the order required Franklin to specially manufacture the article ordered. Ivey also agreed at the hearing with respect to this subject matter that Franklin was entitled to full credit without regard to any limitation in the contract wherever goods were returned because color was in any way involved. This was because of the poor reproduction of colors by the publications publishing the advertisements Ivey produced for the fall of 1947 advertising campaign and as to which there had been an adjustment between Ivey and the publications. In the spring of 1948 campaign no color but only black and white advertising was used. However, Ivey claimed that where a slip cover for the standard size chair or couch as advertised, was shipped and the customer made no complaint as to the color or style but returned the merchandise claiming it did not fit his furniture, then an order having been placed, the price paid, the goods shipped, the goods returned and price refunded, there was a return sale as contemplated by the contract.

"A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price.": Sales Act, 1915, May 19, P. L. 543, §1, 69 PS §1. While the word "sale" has many different connotations depending upon the transaction to which it is applied, obviously under the circumstances just described where the purchaser admittedly received exactly what he had ordered and paid for, there was a sale in the first instance and acceptance of a return of the merchandise with the price refunded should be regarded as a return sale. If not so regarded, then the provision as to return sales would

be rendered meaningless. The contract limitation on return sales was not confined to returns made for any particular reason or reasons. We think a fair construction of the term "return sale" as here used comprehended transactions where an order was placed for the goods as advertised, the price was paid, goods conforming to the advertisement and order were shipped, the goods were returned and the price was refunded. Ivey desired a break-down of the credits claimed by Franklin under the above quoted general heading which grouped all refunds. The lower court refused to regard any of the refunds as covering return sales. This was error. The defendant was seeking credits and the burden was on it to justify the deduction of refunds from gross sales by showing to what extent they were not return sales, or were returns where color was involved which Ivey agrees were deductible. There must be a restatement of Franklin's account in order to conform to our rulings on the various questions involved, and in such restatement Franklin should set forth refunds made, in a manner that will permit ascertainment of the amount due Ivey under our ruling with respect to such refunds.

The order dismissing the bill is reversed, and the case remanded to the court below for further proceedings in accordance with this opinion.