PENNSYLVANIA RAILROAD COM-
PANY, Third-Party Plaintiff,

v.

ERIE AVENUE WAREHOUSE CO.,
Third-Party Defendant.

Civ. A. No. 23930.

United States District Court
E. D. Pennsylvania.

Nov. 30, 1960.

On Motions April 11, 1961.

---

Raymond W. Midgett, Jr., of Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., for third-party plaintiff.

Joseph J. Murphy, Philadelphia, Pa., for third-party defendant.

VAN DUSEN, District Judge.

## I. History of the Case

On January 14, 1958, the original plaintiff, Alma M. Day, Administratrix of the Estate of Edward S. Day, brought suit against The Pennsylvania Railroad Company under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. Her complaint alleged that her husband died as a result of injuries received when he was crushed in a close clearance because of the Railroad's negligence (Exhibit P–2, N.T., 16–17, 514).

On February 27, 1958, the Railroad joined Erie Avenue Warehouse Co., on whose premises the accident had occurred, as a third-party defendant. The third-party complaint alleged that the Railroad was entitled to indemnity or contribution from Erie under a written sidetrack agreement and under the common law of Pennsylvania [1] (N.T. 15; Document No. 6).

Thereafter, the Railroad carried on settlement negotiations with the original plaintiff's attorney. Although Erie was invited to do so, it declined either to participate in the negotiations or to contribute toward a proposed settlement (N.T. 20, 34; Exhibits P–7 and P–8, N.T. 34, 36, 517). After notice to Erie, the Railroad settled the original plaintiff's claim for $75,000 on August 6, 1958 (N.T. 20–21; Exhibit P–4, N.T. 21, 515). On the same day, that settlement was approved by the Honorable C. William Kraft, Jr., District Judge (Exhibit P–15, N.T. 522). At the pre-trial conference, Erie's attorney stipulated that "the amount paid in settlement by defendant * * * to wit, $75,000, was fair and reasonable" (N.T. 42).

After extensive discovery had been undertaken and after Erie's motion to transfer the third-party action from the non-jury trial calendar to the jury trial calendar had been denied by Honorable John W. Lord, Jr., District Judge (Document No. 27), defendant moved to have the third-party action dismissed. Defendant contended that the settlement of the original plaintiff's action had divested the court of jurisdiction over the third-party action since there were no independent Federal jurisdictional grounds (both the Railroad and Erie were Pennsylvania corporations, N.T. 607). On May 1, 1959, the Honorable Herbert F. Goodrich, Circuit Judge, specially presiding, dismissed Erie's motion (Document No. 38).[2]

For purposes of brevity, third-party plaintiff will be referred to as plaintiff or Railroad and third-party defendant will be referred to as defendant or Erie.

In view of the allegation in the defendant's brief (p. 31 of Document No. 73) that "the testimony of (the witnesses employed by the Railroad) in material parts is completely unworthy of belief", the trial judge states that he rejects this allegation and finds that such witnesses did their best to testify as accurately as

---

1. At the beginning of the trial, the Railroad said it would rely upon its right under the sidetrack agreement and withdrew the Second and Fourth Counts of the third-party complaint (N. T. 15–16).

2. See, also, Dery v. Wyer, 2 Cir., 1959, 265 F.2d 804, 806–809.

possible. Coulter and Clausing were particularly accurate witnesses.

## II. Findings of Fact

1. Plaintiff is the Pennsylvania Railroad Company, a Pennsylvania corporation.

2. Defendant is Erie Avenue Warehouse Co., a Pennsylvania corporation, with its principal offices and warehousing facilities on the premises bounded by Front Street, Erie Avenue, Second Street, and the line of the Connecting Railroad Company, which is operated by plaintiff.

3. On July 28, 1955, the parties entered into a written "Agreement for Industry Track" (Exhibit P-3), which set forth the terms under which Railroad would serve the sidetrack located on the warehouse premises.

4. The agreement was in effect on October 20, 1957.

5. On that date, in the evening, a five-man railroad crew was engaged in switching operations on the warehouse sidetrack.

6. Prior to entering the warehouse property on the night of October 20, 1957, Conductor Andrews, in charge of the Railroad crew, instructed the crew members that there were both side and overhead close clearances on the warehouse grounds and told them not to ride on the top or on the side of cars while on the property. He and Brakeman Coulter were the only two members of the crew who had previously been on Erie's premises. All the crew, including one Edward S. Day, a 33-year old brakeman who had worked in such capacity for the Railroad for six years prior to that date, were present when said instructions were given.

7. After a 30 to 40 minute operation on "C" track of Erie's premises, the crew and the shifting engine, which was facing west, went from defendant's grounds to the Railroad's tracks, where two boxcars were coupled to the front of the engine. The engine then pushed the two boxcars west on "A" lead.

8. The "A" lead runs generally in a westerly direction along the Railroad's right-of-way and then curves to the northwest through a gate in the cyclone fence bordering Erie's premises. Thereafter, the curve becomes sharper as the tracks pass between two buildings. At the point where "A" lead begins to straighten, there is a switch ("D" switch) to another track ("D" lead) which runs to the south from "A" lead. A short distance farther west along "A" lead, another track, which was out of service, branches to the north from "A" lead (see Exhibit A to P-3 and P-10).

9. The cars were pushed onto Erie's premises after the warehouse gate on "A" lead was opened by a Globe System guard working for Erie.

10. As the cars moved west on "A" lead inside the warehouse premises, Fireman Heidke, who was operating the locomotive, received signals from Brakeman Day. Day, for part of the westward move, rode on the first rung of the ladder on the north side of the lead boxcar. At a place where the clearance seemed close, the fireman stopped the cars, at which time Day climbed the ladder to the top of the car.

11. The westward move was halted when the westernmost boxcar had passed the "D" switch and was about 30 feet beyond it. The "stop" signal was given by Coulter and Day, who were then standing on the ground about 40 feet west of the lead boxcar.

12. Conductor Andrews joined the two brakemen and explained the move that would have to be made to reverse the order of the boxcars before placing them further west on "A" lead.[3] He

3. In order to reverse the order of the two boxcars, the draft was to be moved eastward past the "D" switch, then stopped. The westernmost car was then to be placed on the "D" lead and the easternmost car on "A" lead past the "D" switch. The car on the "D" lead would then be placed between the boxcar on "A" lead and the locomotive. The draft would then proceed westward on "A" lead.

then walked westward along "A" lead to see if the track was clear.

13. Coulter and Day, or Day alone, then gave the "back up" signal to Fireman Heidke with electric hand lanterns and the draft started eastward at about one or two miles per hour, the locomotive pulling the boxcars.

14. At the time the back-up signal was given, the two brakemen were on the ground on the north side of the "A" lead at the west end of the cars. As the draft moved eastward, they walked toward it along the north side of the lead, Day leading the way and Coulter following him (N.T. 135-6).

15. The ground along the north side of the track was uneven, a gully or ditch having been made by water running down and washing dirt away. Weeds and debris were present in the ditch, in which the men walked. The ditch varied from three to eight inches in depth (N.T. 77, 78, 80).

16. On the left or north of the "A" track, as the two men walked eastward and had passed the unused track north of the "A" lead, was a concrete retaining wall which was physically attached to a warehouse building.

17. When the cars cleared the "D" switch, Brakeman Coulter gave Brakeman Day the "stop" signal, which he expected Day to relay. Day was then approximately 20 feet east of Coulter and positioned between the center of the westernmost car and the concrete retaining wall. He was giving the "slow" or "hold-up" signal (which precedes the "stop" signal) by holding his lamp steady above his head.

18. Coulter then crossed the track to the south side on his way to the "D" switch. Just as he crossed the southern rail and before he had time to operate the switch, he heard a scream and moved immediately to the north side of the track.

19. The draft was still moving when he heard the scream but had stopped when he reached the north side of the track.

20. He found Brakeman Day with his head wedged between the wall and the western edge of the door of the westernmost boxcar, his face toward the engine, his body facing the car, and his back to the concrete retaining wall. There was a deep laceration on his right eye, his shirt was torn at the right side, and his lantern was on the top of his head. Brakeman Day was dead when Coulter reached him. There were no eyewitnesses to the accident causing his death.

21. At the place where Day's body was found, the distance between the wall and the boxcar door was only 8½ inches. The side ladder of the boxcar (west of the door) was 31 inches from the retaining wall, showing the rapid narrowing of the space between wall and track (see Exhibit D of Document No. 16 and Exhibit P-10).

22. At or about the place Day's body was found, the concrete retaining wall measured 74 inches from the ground to its top and was 58 inches above the top of the rail. The top of the wall in the vicinity of the accident was littered with objects such as metal and pipe, which would have made walking thereon that night dangerous.

23. There were no close clearance warning signs on the north side of the "A" lead where the accident occurred. One sign, warning of close *overhead* clearance, was on the ground south of the track and approximately 80 to 120 feet east of the place where Day's body was found. Two other signs, on the building south of the track, were badly weathered and from a distance appeared to read "No Smoking." The words "close clearance" on these two signs were not visible at a distance of more than 10 feet.

24. When working in an area where there are close clearances, Conductor Andrews testified that railroad crews were "mostly guided by close clearance signs and the like of that" (N.T. 213-4).

25. On October 20, 1957, at the time of Day's death, the only light on the "A" lead came from the hand lamps of

the crew members, the locomotive, and some illumination which came from lights on Erie Avenue, outside the warehouse property.

26. The weather was dark and clear at or about 8 P.M. on October 20, 1957, when Brakeman Day was killed.

27. The condition of the ditch on the north side of the "A" lead was worse on October 20, 1957, than it had been a month or more previously. Said gully or ditch was 1½ to 2 feet wide at the place where Brakeman Day's body was found. Conductor Andrews, who had been on the premises prior to October 20, 1957, had complained about said ditches to his yardmaster.

28. The railroad tracks and the concrete retaining wall against which Brakeman Day was crushed were in existence prior to the execution of the siding agreement between the parties in 1955.

29. There were no changes made in reference to the location of the retaining wall or the "A" lead track by either party between the time the siding agreement was made and October 20, 1957.

30. At no time prior to Brakeman Day's death did any Railroad official complain of the close clearances on the "A" lead to the president or track foreman of Erie, who were the officials to whom such complaints would normally have been directed, nor was any request made that Erie correct the clearances. The officials of Erie made no effort to eliminate, and gave no consideration to eliminating, close clearances in the vicinity of the fatal accident to Day prior to his death. Erie was never requested to change any of the conditions present or provide lighting or warning signs.

31. Day's death was caused by an unsafe clearance on the north side of "A" lead.

32. Railroad's requested Findings of Fact Nos. 15 to 22 (see Document No. 70) are adopted as findings of fact of the court.

33. The sums expended by Railroad in the defense and settlement of the original plaintiff's claim were caused by an unsafe clearance space to the north side of the "A" lead.

All Requests for Findings of Fact (Documents Nos. 70 and 71) inconsistent with the foregoing and with the facts stated in the Discussion below are denied.

In view of the terms of Section 7 of Exhibit P–3, many findings of fact requested by the parties, such as those bearing on the lack of contributory negligence of the decedent Day,[4] are irrelevant but the trial judge specifically approves as factually accurate these Requests of the parties for Findings of Fact, in addition to the plaintiff's Requests adopted above:

A. Plaintiff's Requests Nos. 3–5, 6 except for the seventh sentence which contains some minor inaccuracies, 7–9, 11 except for the last sentence, which is a legal conclusion and inappropriate as a finding of fact, 14 and 23–26.

B. Defendant's Requests Nos. 1–3, 8, 15, 23–25, 33, 35, 40, 46, 47, 52, 56, 65, 70, 78, 86 (assuming "them" means "close clearances on the 'A' lead"), and 89.[5]

### III. Discussion

Edward S. Day, a 33-year old freight brakeman employed by the Railroad, was killed at or about 8:05 P.M. on October 20, 1957, while he was engaged in switching operations on the "A" lead on the premises of Erie. He had never worked

4. See Kennedy v. Pennsylvania Railroad Co. et al., 3 Cir., 282 F.2d 705. If a conclusion of law on the subject were necessary, the trial judge would conclude that Day was not contributorily negligent.

5. The others Requests of defendant, many of which are argumentative or vaguely

phrased (for example, what spot on the south side is referred to in No. 51), appear to be inaccurate, at least in part. See comment on these Requests at pages 13–14 of the Reply Brief (Document No. 74). See, also, attached letter of defendant of 9/13/60.

on the warehouse property previous to this date (N.T. 206–7). He was killed when his head was wedged between a boxcar and a concrete retaining wall attached to a warehouse building. The clearance on the north side of the track is dangerous and deceptive, funneling from 31 inches to 7 inches in approximately 15 feet. Although the accident causing his death was not actually seen by anyone, his body was found near the same place where he had been last seen by a co-worker. His death was due to this hazardous, close clearance. The site of the accident was guarded by Security Officers working for Erie (pp. 52–53, Document No. 66). Although crews of the Railroad worked almost daily at this location, no report of this condition beside the track on the north side of the "A" lead was made to Railroad. The retaining wall and track had been in the same position for several years. The ditch and the weed growth north of the track had been present for some period of time, but had been becoming worse. There was debris along the top of the retaining wall on the night of the accident which may have caused this otherwise safe walking space to be avoided by Day (see Exhibits A–C, S and L of Document No. 16).

*Liability of Railroad*

 Under the F.E.L.A. (45 U.S. C.A. § 51 ff.), the Railroad is "negligent" if it fails to use reasonable care to furnish its employees a safe place to work, whether the employees are working on railroad property or on the property of a third person. Bailey v. Central Vermont Ry., 1943, 319 U.S. 350, 352–354, 63 S.Ct. 1062, 87 L.Ed. 1444. If this negligence plays *any* part in producing the death or injury for which damages are claimed, the Railroad is liable under the F.E.L.A. Rogers v. Missouri Pacific R. Co., 1957, 352 U.S. 500, 506–507, 77 S.Ct. 443, 1 L.Ed.2d 493.

██ ██ This record discloses that reasonable care was not used to provide Day with a safe place to work and that this negligence played a part in his death.[6] Day, who had never worked on the warehouse premises before the night of his death (N.T. 206–7), was permitted to work thereon in spite of the following conditions: hazardous walking, the deceptive, close clearance, and lack of proper warning signs at or about the place of this close clearance. That no one actually saw the accident does not preclude the factfinder from determining, by circumstantial evidence and inference, the Railroad's negligence was a cause of the fatal accident. Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 526, 76 S.Ct. 608, 100 L.Ed. 668. See, also, Connor v. Hawk, 1957, 387 Pa. 480, 482–483, 128 A.2d 566; Foley v. Pittsburgh-Des Moines Co., 1949, 363 Pa. 1, 24–25, 68 A.2d 517.

 Since the administratrix of the Estate of Edward S. Day would have probably recovered against the Railroad under the F.E.L.A. if the original action had gone to trial, the Railroad's settlement with the administratrix was not voluntary, but rather a loss incurred by the Railroad based on its statutory obligation to the decedent.[7]

*Liability of Erie to Railroad*

The parties entered into a siding agreement on July 28, 1955. Under its terms, Erie owned and was obligated to maintain and renew the portion of the sidetrack being used at the time of Day's death (Nos. 3 & 4, Exhibit P–3). The agreement states:

> "7. The Industry shall at all times hereafter establish and maintain on its property a clear and safe space above and on each side of the side track sufficient to insure the safety of employees and equipment of the Railroad Company, and the

---

6. Defendant has admitted that Railroad was negligent in failing to provide the decedent with a safe place to work (Request for Admission, Par. 74, Document No. 44; N. T. 511).

7. Erie has stipulated that the said amount of the settlement was reasonable (N. T. 42, 43).

Industry shall indemnify and save harmless the Railroad Company from loss, damage and expense for failure so to do * * *."

"9. The Industry also agrees to indemnify and hold harmless the Railroad Company for loss, damage or injury from any act or omission of the Industry, its employees or agents, to the person or property of the parties hereto and their employees, and to the person or property of any other person or corporation, while on or about the side track. If any claim or liability, other than from fire caused by locomotives as aforesaid, shall arise from the joint or concurring negligence of both parties hereto it shall be borne by them equally. The Industry also agrees to indemnify and hold harmless the Railroad Company for loss, damage or injury of any nature resulting from operation by the Railroad Company over the tracks of the Industry when such loss, damage or injury is due to any unsafe condition of the premises of the Industry."

There is no dispute that the sidetracks and the buildings and walk on "A" lead were already existing at the time of the agreement and that this agreement was virtually the same as that entered into between the Railroad and its former lessee.

■■ The rights of the parties are to be determined under contract law of indemnity. Cf. Foster v. Pennsylvania R. Co., 3 Cir., 1953, 201 F.2d 727. The contract of indemnity is governed by Pennsylvania law.[8]

### Right to Indemnity

■ Paragraph 7 specifically defines the rights of the parties where a liability is imposed on the Railroad because of the failure of Erie to establish and maintain a clear and safe clearance on the sidetrack. Such a specific paragraph controls over a general paragraph (such as paragraph 9) in the contract. J. E. Faltin Motor Transp., Inc. v. Eazor Express, Inc., 3 Cir., 1960, 273 F.2d 444, 445. See, also, Harrity v. Continental-Equitable Title & Trust Co., 1924, 280 Pa. 237, 242, 124 A. 493.

■ Erie contracted to "at all times hereafter establish and maintain a clear and safe place over and on each side of the sidetrack sufficient to insure the safety of employees and equipment of the Railroad" and to indemnify the Railroad for any failure to do so. The clearance which existed at the time and place of Day's death was not a safe and clear one. In spite of the language in paragraph 7, Erie contends that it was not obligated to change any clearances already existing. This contention is not persuasive. Erie had a duty to "establish", as well as "maintain," safe clearances. If this provision were interpreted so as not to refer to clearances in existence on July 28, 1955, the court would, in fact, be eliminating the word "establish" from the paragraph. "It would not be good interpretation to disregard language of the parties as meaningless or absurd if that can be avoided." J. E. Faltin Motor Transp., Inc., v. Eazor Express, Inc., supra [273 F.2d 445];[9] Neal D. Ivey Co. v. Franklin Associates, Inc., 1952, 370 Pa. 225, 231, 87 A.2d 236; Morris v. American Liability &

8. The contract was executed in Pennsylvania, the property is situated in Pennsylvania, and the agreements entered into under it were to be performed in Pennsylvania.

9. Erie's claim (page 13 of its brief—Document No. 73) that the language in paragraph 2 of the contract, stating "no construction work is necessary," shows that clearances already existing were not intended to be covered under paragraph 7

is without merit since that language clearly refers to the subject matter preceding it (cost of constructing track, roadbeds, etc.) in paragraph 2 and not to the paragraph under discussion. Also, the lack of need for construction of sidetrack does not affect the necessity of removing a retaining wall to provide better clearances, unless Erie was willing to indemnify Railroad against "loss, damages and expenses for failure so to do."

Surety Co., 1936, 322 Pa. 91, 94, 185 A. 201.

The cases which involve paragraphs similar to Paragraph 7 in the present contract indicate that such specific paragraphs are to be interpreted according to their terms. In Deep Vein Coal Co. v. Chicago & E. I. Ry. Co., 7 Cir., 1934, 71 F.2d 963, the court held that the fact that the railroad allowed the unsafe close clearance to remain did not reduce the liability of the industry from full indemnity to mere contribution. In Watkins v. Baltimore & O. R. Co., D.C. W.D.Pa.1939, 29 F.Supp. 700, the contract provided that the industry would indemnify the railroad by reason of the erection of any building, etc., which did not provide for a six-foot clearance between it and the nearest rail. An employee of the industry was killed in an accident caused by railroad negligence in working on conveyors constructed within six feet of the nearest rail. In denying the motion to dismiss the third-party complaint, the court said the industry (third-party defendant) was liable to the railroad regardless of whether the railroad's negligence was the proximate cause of death, since the employee was working within the prohibited area covered by the agreement when injured. See, also, Gollick v. New York Central Railroad Co., D.C.E.D.Mich.1956, 138 F. Supp. 384, and Buckeye Cotton Oil Co. v. Louisville & N. R. Co., 6 Cir., 1928, 24 F.2d 347.

The Railroad had the right to protect itself against the increased hazard incurred by permitting its employees to work on the premises of another. Cf. National Transit Co. v. Davis, 3 Cir., 1925, 6 F.2d 729, 733, certiorari denied 269 U.S. 579, 46 S.Ct. 104, 70 L.Ed. 422. It did so in paragraph 7. The provision was sufficient to extend to cases where the Railroad suffered loss because of its duty under the F.E.L.A.[10] Kennedy v. Pennsylvania Railroad Co., 3 Cir., 1960, 282 F.2d 705. Under the contract, the Railroad is entitled to full indemnity from Erie.[11]

*Defense of Alleged Acquiescence*

Defendant's contention that the Railroad is precluded from any indemnity because it was aware of, and acquiesced in, the close clearance at the point of the accident is not supported by the applicable legal principles, particularly in view of the absence of any wilful or reckless conduct on the Railroad's part, for the reasons stated below:

A. Where there is an express promise of indemnity, such as Section 7, acquiescence is no defense and neither of the cases relied on by defendant in support of its contention that plaintiff may not recover due to its alleged acquiescence in the close clearance involve a contractual provision similar to that con-

10. Chicago, R. I. & P. R. Co. v. Dobry Flour Mills, 10 Cir., 1954, 211 F.2d 785, 788, holds that in construing the indemnity provision of a sidetrack agreement the industry's liability is to be determined by taking into account the F.E.L.A. standard that governs the Railroad's liability to its employee. Also, in its recent Kennedy decision, supra (footnote 4), the United States Court of Appeals for the Third Circuit said in footnote 2: "A bare agreement to indemnify without mention of F. E. L. A. liability would suffice because 'the parties to the contract are held to have known of the existence of the federal statute at the time they executed their agreement.' Wanser v. Long Island R. R. Co., 2 Cir., 1956, 238 F.2d 467, 470, certiorari denied, Long Island R. Co. v. Central Islip Co-op., etc., 1957, 353 U.S. 911, 77 S.Ct. 668, 1 L.Ed.2d 665." (282 F.2d 708.]

11. Contentions of Erie that indemnity should be denied because the Railroad was "actively" negligent or because it "acquiesced" in the unsafe condition of the sidetrack are not applicable. "In the area of contractual indemnity an application of the theories of 'active' or 'passive' as well as 'primary' or 'secondary' negligence is inappropriate." Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 569, 78 S.Ct. 438, 442, 2 L.Ed.2d 491. Cf. Ratigan v. New York Central Railroad Co., D.C.N.D.N.Y.1960, 181 F.Supp. 228.

tained in Section 7 of this sidetrack agreement.[12]

 Wherever loss is occasioned to Railroad by the failure to establish and maintain a clear and safe space on each side of the track sufficient to insure safety of the employees, Railroad is entitled to recover, irrespective of its negligence, and acquiescence is no defense due to the terms of the contract. See National Transit Co. v. Davis, 3 Cir., 1925, 6 F.2d 729, 733; Deep Vein Coal Co. v. Chicago & E. I. Ry. Co., 7 Cir., 1934, 71 F.2d 963, 965.[13] Such indemnity clauses are valid in Pennsylvania even though indemnification is granted to a negligent party. See Tidewater Field Warehouses v. Fred Whitaker Co., 1952, 370 Pa. 538, 88 A.2d 796, and cases there cited.

The terms of the agreements in Baltimore & Ohio R. Co. v. Alpha Portland Cement Co., 3 Cir., 1955, 218 F.2d 207, and Foster v. Pennsylvania R. Co., 3 Cir., 1953, 201 F.2d 727, are of a more general nature than paragraph 7 of the instant contract. In both cases the industry agreed to indemnify the railroad for any loss, damage or injury incurred by it due to any act or omission of the industry which caused harm to any person while on or about the track (compare with paragraph 9 of the instant contract).

B. The Sections of the Restatement of Restitution forming the basis for decisions relied on by defendant[14] are inapplicable to this situation in view of the wording of section 7 of the sidetrack agreement and the facts of this case.

Both the General Scope Note to the Restatement of Restitution (pp. 1–3) and in Introductory Note to Topic 3, which includes Sections 95 and 102 (pp. 327–331), make clear that this Restatement is not concerned with rights arising upon breach of an express contract. The General Scope Note contains this language at page 2:

"The restitutionary rights which arise upon the breach or non-performance of a contract and those which arise from the performance or non-performance of a trust are included only by cross-reference to the Restatement of Contracts and of Trusts, except where a constructive trust arises."

The Introductory Note uses these words at page 329:

"The Restatement of this Subject does not deal with liability based solely upon breach of contract * * nor with the measure of damages arising therefrom."

Sections 95 [15] and 102 [16] of the Restatement of Restitution are part of Chapter 3, Title C, of that Restatement, which is entitled "Indemnity and Contribution Between Tort Feasors." The Introductory Note to this Title C contains this language (pp. 387–8 of Restatement of Restitution):

" * * * there are many situations in which indemnity can be obtained, including those where the person seeking it was negligent in committing the tort. * * * It is to be noted that at the beginning of the nineteenth century when the rules were first formulated, negli-

---

12. The cases cited under this heading may make points B and C below surplusage but, in view of the use of the language quoted in C below from the recent Kennedy decision supra, at footnote 4, these points are being included.

13. The different between the construction to be given to a sidetrack agreement of this type, giving complete indemnification for specific losses, and contracts providing for indemnification generally has been recognized in the cases involving side-

track agreements. See Dry v. Wyer, 2 Cir., 1959, 265 F.2d 804, 810, and cases there cited.

14. Page 20 ff. of defendant's brief (Document No. 73).

15. See Baltimore & Ohio R. Co. v. Alpha Portland Cement Co., 3 Cir., 1955, 218 F.2d 207, 212.

16. See Foster v. Pennsylvania R. Co., 3 Cir., 1953, 201 F.2d 727, 731.

gence was ordinarily a defense to restitution even where there had been merely a transfer of property by mistake and the identity of master and servant was treated as a fact. Today, however, negligence is no longer a defense to an action for restitution * * *. Consistently with this changed viewpoint the courts have been increasingly astute in finding the reasons which permit restitution to be granted by one tortfeasor against another, and the trend of statutes is strongly towards permitting restitution to all except wilful or reckless wrongdoers. Nevertheless, there is a considerable remnant of the earlier viewpoint, especially where contribution is sought.

* * * * * *

"No attempt has been made in this Topic to state rules which cover all types of situations. Only those rules have been stated for which there is direct authority in the cases or for which the implications of the cases are clear."

The above language and a reading of the comment under § 95 indicate that knowledge of the existence of a dangerous condition is not sufficient to preclude recovery under a contractual indemnity provision, such as § 7 of Exhibit P–3, where there is no wilful or reckless conduct on the part of the person entitled to indemnity under a written contract such as this Section 7. However, comment a. of § 95 uses this language at pp. 416–7, which the trial judge does not believe is applicable in view of the language of this contract:

"The fact that the payor knew of the existence of the dangerous condition is not of itself sufficient to bar him from restitution. In many cases it is only because he had

knowledge of the condition that he is liable to the person harmed. If, however, the payor not only knew of the condition but acquiesced in its continuance, he becomes in effect a joint participant with the other in the tortious conduct and hence is barred from indemnity."

Assuming this language to be applicable, by failing to correct, or demand correction of, a dangerous condition not created by it and existing on Erie's land, Railroad did not become a "joint participant" in the maintenance of such condition in view of its agreement to come upon this land solely under terms whereby the landowner would indemnify it from any loss, damage and expense resulting from failure to establish and maintain "a clear and safe space along and on each side of the sidetrack." [17]

Section 102 of the Restatement of Restitution, cited in the Foster case, supra, concerns actions for contribution, rather than indemnity, and, hence, is inapplicable to this situation.

C. Bare knowledge of a dangerous condition will not preclude plaintiff from obtaining indemnity in view of Section 7 of the sidetrack agreement.

In Kennedy v. Pennsylvania Railroad Co., 3 Cir., 1960, 282 F.2d 705, 710, the United States Court of Appeals for the Third Circuit said:

"However, if Steel's obligation to maintain the crossing is based on an express agreement, bare knowledge of a dangerous condition will not preclude Railroad from obtaining indemnity. But if Railroad not only knew of the condition but acquiesced in its continuance Railroad's failure to make the crossing safe was reckless. Restatement, Restitution § 95."

17. The trial judge does not agree with the following statement at p. 17 of defendant's brief (Document No. 73):
"In this case there is not a scintilla of evidence that Erie was guilty of any negligence act of commission or omission by any servant, agent or employee which was the proximate cause of Day's death."

This record indicates that Railroad only had "bare knowledge" of the fatal close clearance.

Although the record reveals that the Railroad, through charts in its file and use of the "A" lead, had knowledge of the close clearance at the place of the accident, there is no evidence that any Railroad employee (or, in fact, anyone else except Erie's president—pp. 37–39 of Document No. 66) thought this particular location was the deceptively dangerous one which this accident has revealed. The Brakeman Coulter, who had been on this sidetrack before, did not recall that there was such a close clearance at this particular point (N.T. 123).[18] The conductor had reported that "the shifting on the Erie Avenue Warehouse premises should be made in daylight because of hazardous conditions at that siding" (N.T. 280–1), but this could have referred to various points on the "A" or "D" tracks and possibly to the "C" lead. After the accident, the conductor recognized that the sharp break in the clearance at the point of the accident constituted a hazard, but there is no showing he realized this, as opposed to many other places on the premises, as a particular point of danger prior to the accident. The monthly track inspections by plaintiff's representatives dealt solely with the condition of the track and not with clearances, unless (1) there had been some change since the previous inspection or (2) there was some obvious source of difficulty. There had been no such change in this clearance since defendant's occupancy of the premises and this close clearance, which was admittedly deceptive in the hazard presented by its "funneling" character as approached on an easterly movement, was only noticeable with a car on the track.

■ Although it is not necessary to consider the Railroad's right to contribution, it seems clear that, if the trial judge is in error in the foregoing discussion, plaintiff is entitled to contribution in this case at the least. See pages 17–18 of plaintiff's original brief (Document No. 72) and pages 12–13 of plaintiff's reply brief (Document No. 74).

### IV. Conclusions of Law

1. This court has jurisdiction over the parties and the subject matter.

2. The record justifies the conclusion that the Railroad was liable to the original plaintiff under the Federal Employers' Liability Act.

3. The Railroad was not responsible for any gross negligence, recklessness or wilful conduct which contributed in any part to the death of Edward S. Day on October 20, 1957.

4. The amounts paid by Railroad for the defense and in settlement of the original plaintiff's claim were reasonable.

5. Railroad is entitled to indemnity from Erie for the sums paid for the defense and in settlement of the original plaintiff's claim, which total $76,-800.00.

6. Railroad is entitled to interest at the rate of 6% on the sum of $76,800.00 from August 6, 1958 (see page 19 of plaintiff's brief, being Document No. 72), and costs.

Plaintiff's Requests for Conclusions of Law (Document No. 70) are approved,

---

18. Coulter testified as follows (N. T. 122–3):

"Well, with no car there you wouldn't observe that clearance; it wouldn't be too noticeable. This clearance you are talking about is deceiving, due to the fact that even when you are moving a car there—that is, at the time this accident happened—as I said before, the clearance is of several feet, and as you move east with the car the clearance reduces sharply to a matter of inches.

\* \* \* \* \*
" \* \* \* at this particular time I did not recall that clearance being that close."

The trial judge finds that Andrews' statement that Coulter told Day "about the close clearance at the wall where he was found" (N. T. 229) was inaccurate in view of Coulter's testimony quoted above and his failure to mention such a conversation. As stated above, Coulter was the more accurate witness.

except the words following "and" in the fourth line of paragraph 4, and defendant's Requests for Conclusions of Law (Document No. 71) which are inconsistent with the foregoing Conclusions and Discussion are denied.[19]

### On Motions

The factual background for this third-party action is contained in the History of the Case, Findings of Fact and Discussion filed November 30, 1960 (Document No. 76). In the Conclusions of Law filed at that time, the trial judge held that defendant [1] was liable to indemnify plaintiff, pursuant to § 7 [2] of a side track agreement between the parties to this third-party action, for the amounts plaintiff paid in defense and settlement of the original plaintiff's (third-party plaintiff's employee's) claim under the Federal Employers' Liability Act (45 U.S.C.A. § 51). See pp. 13–23 of Document No. 76.

### I. Motion For New Trial
### (pp. 1–7 of Document No. 79)

At the request of counsel for defendant (N.T. 824 ff.) the trial judge stated at the conclusion of the trial that he would permit counsel to present oral argument after the filing of Requests for Findings of Fact and Conclusions of Law and briefs (N.T. 830), even though presentation of such oral argument was contrary to the practice of the trial judge and is not provided for in either the Local Rules of this Court or the Federal Rules of Civil Procedure, 28 U.S.C. After a reply brief and rebuttal letter had been filed over three months after the conclusion of the trial (see Document No. 74 and letter attached

to Document No. 76), the trial judge proceeded to prepare and file Findings of Fact, Conclusions of Law and an Order entering judgment (Document No. 76), having forgotten the statement at the conclusion of the trial that such oral argument would be held in this case. Since an alleged "failure to permit oral argument" [3] was stated as a basis for the Motion For New Trial (see par. 40 of Document No. 79), the trial judge permitted counsel for defendant to present lengthy argument (lasting over one hour [4]), as well as a rebuttal argument, in support of his position at the time of the argument on the post-trial motions and granted him the privilege of specifying in detail his factual contentions in a letter to be filed later (see letter of March 6, 1961, attached to this Memorandum Opinion). The oral argument, 28-page brief (Document No. 80), and 7-page letter of March 6, in addition to the documents (Nos. 69, 73, and letter of 9/13/60 attached to Document No. 76) previously submitted by counsel for defendant, have been reviewed by the trial judge, who reaffirms the Findings of Fact, Conclusions of Law and Discussion previously filed (Document No. 76). Under these circumstances, the failure to give counsel for defendant the opportunity to present oral argument subsequent to filing his Requests for Findings of Fact and Conclusions of Law and prior to the filing of Document No. 76 is not a proper ground for a new trial.

Also, the other grounds for a new trial relied on by defendant do not justify the grant of this Motion. See F.R.Civ.P. 61.[5]

---

19. Paragraph 7 of defendant's Requests for Conclusion of Law is affirmed.

1. Third-party plaintiff will be referred to as plaintiff or Railroad and third-party defendant will be referred to as defendant or Erie.

2. See, also, last sentence of § 9 of the Agreement (Exhibit P–3).

3. It is noted that counsel for defendant had been permitted to present lengthy

oral argument at the conclusion of plaintiff's case (see N. T. 540–565).

4. See attached Memorandum For File of 2/17/61.

5. With reference to pp. 20–21 of defendant's brief (Document No. 80), it has been repeatedly held that a Federal Judge is not a mere moderator but that he has an affirmative duty to see that the relevant evidence is disclosed at the trial.

II. Motion to Amend Judgment and Findings of Fact and Conclusions of Law, and To Enter Judgment For the Defendant Under F.R.C.P. 52(b)

Defendant contends at pp. 7 ff. of its brief (Document No. 80) that plaintiff is precluded from any contractual indemnity under Wanser v. Long Island Railroad Co., 2 Cir., 1956, 238 F.2d 467, certiorari denied Long Island R. Co. v. Central Islip Co-op., etc., 1957, 353 U.S. 911, 77 S.Ct. 668, 1 L.Ed.2d 665. However, the language in the contract of indemnity before the court in the Wanser case is quite different from the language contained in § 7 of this "Agreement for Industry Track" (cf. Exhibit P-3 and pages 469–470 of 238 F.2d). This difference in language has been recognized by the court which, decided the Wanser case, supra. See Dery v. Wyer, 2 Cir., 1959, 265 F.2d 804, 810.[6]

Pages 16 to 22 of Document No. 76 cover the reasons why the alleged acquiescence in the close clearance does not prevent recovery in this case. The cases based on the doctrine stated in Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, (see pp. 25 & 26 of defendant's brief, being Document No. 80) do not hold that, even where there is no written contract of indemnity as there was here, an indemnitee who has been negligent may not recover from his indemnitor. See Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., supra, 350 U.S. at pages 134–135, 76 S.Ct. at pages 237–238; Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 568, 78 S.Ct. 438, 2 L.Ed.2d 491; Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413;[7] Calmar Steamship Corp. v. Nacirema Operating Co., 4 Cir., 1959, 266 F.2d 79, 80–81; American Export Lines, Inc. v. Revel, 4 Cir., 1959, 266 F.2d 82, 87. In the Calmar case, the court used this language at page 81 of 266 F.2d:

"Nor do we think the cases distinguishable on the ground that here the triers of fact found that the supplying of defective equipment constituted unseaworthiness and negligence, while in Crumady the trier of fact found simply that the defective equipment made the ship unseaworthy but made no specific finding as to negligence. The claim was never raised by the plaintiff in Crumady that the shipowner was negligent in supplying an improperly set cut-off device. The fact that such a finding was made in this case is not determinative of the right of the shipowner to recover indemnity. *The action over is in contract, and whether the shipowner can recover turns upon whether his actions are such as to bar the enforcement of the contract, and not upon whether he has or has not been found negligent in regard to the longshoreman.*

"Of little consequence also is it that the actions of the stevedore

---

See Peckham v. Family Loan Co., 5 Cir., 1959, 262 F.2d 422, 424–425; Bowles v. Lentin, 7 Cir., 1945, 151 F.2d 615, 620. Cf. Burch v. Reading Co., D.C.E.D. Pa.1956, 140 F.Supp. 136, 143–144, affirmed 3 Cir., 1957, 240 F.2d 574, certiorari denied 1957, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914.

6. In view of Findings of Fact such as No. 6, that the conductor instructed the crew prior to entering this sidetrack that there were both side and overhead close clearances on the warehouse grounds, many of the cases cited at pp. 9 and 10 of defendant's brief are inapplicable. See, also, Tidewater case, cited at p. 17 of Document No. 76, and comment in attached letter of March 10 on Manufacturers & Merchants Building & Loan Ass'n v. Willey, 1936, 321 Pa. 340, 183 A. 789.

7. In this case, indemnity was granted to the vessel owner even though "The winch —an appurtenance of the vessel—was * * * adjusted by those acting for the vessel owner in a way that made it unsafe and dangerous for the work at hand." At page 427 of 358 U.S., at page 448 of 79 S.Ct.

were found by the District Court to be the primary cause of the accident in Crumady, while the District Court in this case found the actions of the stevedore only a contributing proximate cause. The Supreme Court in Weyerhaeuser pointed out 'that in the area of contractual indemnity an application of the theories of "active" or "passive" as well as "primary" or "secondary" negligence is inappropriate.' 355 U.S. at page 569, 78 S.Ct. at page 442.

"In determining whether the actions of Calmar were such as to bar recovery, we must necessarily compare them to those of the owner in Crumady. Here, the ship did not inspect the light and did not provide seizing. In Crumady the ship's crew supplied a cut-off device which they had set at twice the rated limit of the rigging. Certainly supplying the defective cut-off device was no less a contractual violation there than the supplying of the unseized cargo light here. If the former did not preclude recovery, then, under the principle announced in Crumady, we think the latter should not." (Emphasis supplied.)

The recovery in this case is based on contractual principles of causation. See authorities at pp. 16 and 17 of Document No. 76; cf. Reddick v. McAllister Lighterage Line, 2 Cir., 1958, 258 F.2d 297, 303.

The outline of defendant's contentions in the attached letter of March 6, 1961, has been carefully considered, but the record does not justify any change in the Findings of Fact and Conclusions of Law previously filed (Document No. 76). See brief of plaintiff docketed as Document No. 81.

### III. Motion To Dismiss For Want of Jurisdiction

Page 2 of Document No. 76 discloses that the trial judge concurs in the opinion[8] dated May 1, 1959 (Document No. 38), holding that this court has jurisdiction of this third-party action. However, it is doubtful whether the trial judge has any authority to review the holding of that opinion. See TCF Film Corp. v. Gourley, 3 Cir., 1957, 240 F.2d 711, 713; United States v. Wheeler, 3 Cir., 1958, 256 F.2d 745, 746–748, certiorari denied 1958, 358 U.S. 873, 79 S.Ct. 111, 3 L.Ed.2d 103; Two Guys from Harrison-Allentown, Inc. v. McGinley, 3 Cir., 1959, 266 F.2d 427, 432.

Defendant's letter of March 16, 1961, has been attached to the backer on defendant's brief (Document No. 80).

For the above reasons, these post-trial motions will be denied.

---

8. On this page, the trial judge cited Dery v. Wyer, supra, 265 F.2d at pages 806–809, in additional support of that opinion.