**LINCOLN PULP & PAPER CO., INC., Plaintiff,**

v.

**DRAVO CORPORATION, Defendant and Third-Party Plaintiff,**

v.

**BABCOCK & WILCOX COMPANY, Koppers Company, and Whiting Corporation, Third-Party Defendants.**

**Civ. No. 74–65–ND.**

United States District Court,
D. Maine, N. D.

Aug. 9, 1977.

**264**

Arnold L. Veague, Bernard J. Kubetz, Bangor, Me., William L. D. Barrett, Caroline Martin, Manley Fleischmann, Robert A. Kandel, James V. Ryan, New York City, for plaintiff.

Ralph I. Lancaster, Ernest J. Babcock, Jotham D. Pierce, Jr., Portland, Me., William V. Kane, Allan Tupper Brown, Washington, D. C., Howard H. Dana, Jr., John W. Philbrick, Portland, Me., for defendant and third-party plaintiff.

Gerald F. Petruccelli, Thomas Cox, Portland, Me., Gene Carter, Richard J. Relyea, Bangor, Me., for third-party defendants.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

This action arises from an engineering and construction contract dated December 4, 1970 and executed on March 9, 1971, under which defendant Dravo Corporation ("Dravo") agreed to design and construct a new heat and chemical recovery boiler and associated equipment to modify the existing chemical recovery system at the kraft pulp mill in Lincoln, Maine owned by plaintiff Lincoln Pulp and Paper Co., Inc. ("Lincoln"). Jurisdiction is predicated upon diversity of citizenship, the amount in controversy exceeding $10,000, exclusive of interest and costs. 28 U.S.C. § 1332(a). Count I of the complaint alleges breach of the underlying contract; Count II alleges breach of express and implied warranties; and Count III alleges negligence in design, construction and subsequent repair.[1] Lincoln seeks in excess of $22 million in direct and consequential damages, including the cost of reconstruction and repair as well as loss of past and future profits resulting from lack of past, present and future production capacity.

The contract was for a fixed fee of $5.2 million and specified the work to be per-

---

1. Count IV is not presently before the Court. It asserts a claim for $136,821 in back charges against Dravo for acts, services and purchases furnished by Lincoln during the course of construction. The counterclaim filed by Dravo against Lincoln and the third-party complaints filed by Dravo against Babcock & Wilcox Company, Koppers Company and Whiting Corporation, suppliers of various items of equipment for the recovery system installed by Dravo, are also not presently before the Court.

formed and the equipment guarantees which Dravo undertook to meet. In addition, the contract contains the following clause limiting Dravo's liability for damages:

XX. *Limitation of Liability*

Dravo shall not be liable for any liability or special or consequential damage resulting from loss of time in putting the Unit in operation, or resulting from delays or loss of time affecting other plants or property of Lincoln or for loss of profits or products.

At pretrial conference the Court ordered that the applicability of this limitation of liability clause be separately determined in advance of trial of the remaining issues of liability and damages. For the purposes of the determination of this question, the parties have agreed to assume that Lincoln is able to establish breach of contract, breach of express and implied warranties, and negligence on the part of Dravo, as alleged in the complaint, reserving, however, for further consideration the applicability of the clause in the event Lincoln is able to establish conduct amounting to unconscionability. A three-day evidentiary hearing has been held and the issues have been comprehensively briefed and argued.

The sole issue before the Court at this time is the meaning and effect of the above-quoted limitation of liability clause. Dravo contends that the clause relieves it of all liability to Lincoln (1) for any consequential damages resulting from loss of time in putting the modified chemical recovery system in operation or from delays or loss of time affecting other plants or property of Lincoln, and (2) for loss of profits and products, whether Lincoln's claim for such damages and losses are based upon allegations of breach of contract, breach of warranty, or negligence.[2] Lincoln contends that the clause shields Dravo only from liability for Lincoln's consequential damages, including loss of profits and products, resulting from reasonable delay in start-up, and that if Lincoln establishes

breach of contract, breach of warranty, or negligence, as alleged in the complaint, there should be no other limitation on Lincoln's provable damages. Additionally, Lincoln argues that whatever protection the clause affords is lost to Dravo if Dravo is found to have breached its contractual obligation to promptly repair or replace defective equipment. For the reasons set forth below, the Court has concluded:

(1) That the limitation of liability clause (Section XX) in the Lincoln-Dravo contract protects Dravo from liability for consequential damages, including loss of profits and products, arising from breach of contract or breach of warranty (Counts I and II of the complaint);

(2) That the limitation of liability clause (Section XX) in the Lincoln-Dravo contract does not shield Dravo from liability for consequential damages, including loss of profits and products, resulting from its own negligence (Count III of the complaint); and

(3) That the limitation of liability clause (Section XX) in the Lincoln-Dravo contract is effective to protect Dravo from liability for consequential damages, including loss of profits and products, arising from breach of contract or breach of warranty, even if Dravo is found to have breached its contractual obligation to repair or replace defective equipment.

I.

*The Factual Background*

Lincoln's business includes the operation of a mill in Lincoln, Maine which produces bleached hardwood kraft pulp. After being acquired by Premoid Corporation in 1968, Lincoln sought to expand the capacity of its mill and to modify the plant to meet new State and federal air and water pollution standards. Lincoln determined that an inadequate boiler recovery system was the primary source of pollution and that a larger recovery system would enable the mill to handle a greater volume of pulp by-prod-

---

**2.** Dravo admits that the clause does not shield it from liability for any direct damages, such as costs of repair and replacement, except where caused by delays in start-up.

ucts and increase production. As its own engineering staff was small, Lincoln sought a firm to undertake the engineering and design aspects as well as the construction of the new system. The three features most important to Lincoln in the prospective contract were: 1) a "turn-key" job, that is, a fully operative system to be turned over to Lincoln; 2) a fixed price contract rather than a contingency or cost-plus contract; and 3) specific guarantees of performance. At the time Dravo was a well-established engineer-constructor in other areas of the process industry [3] and was seeking to enter the pulp and paper field.

In December 1969, after various communications between Lincoln and Dravo personnel and in response to Lincoln's verbal inquiry of September 26, 1969, Dravo submitted its first written proposal. Lincoln rejected it primarily because the price was too high. This proposal specified no limitations of Dravo's liability except for a force majeure clause and a requirement that Lincoln reimburse Dravo for costs resulting from any lockout or labor strike beyond Dravo's control. In mid-1970 Lincoln had Rust Engineering Company prepare a separate engineering study to determine the size and type of equipment required for the expansion of the mill's recovery system. Dravo was then asked to prepare a new proposal for the contract.

A second Dravo proposal, dated August 5, 1970, was submitted at a meeting held at Lincoln's executive offices in West Springfield, Massachusetts on August 6. The negotiator for Lincoln was its president, Joseph H. Torras. Dravo was represented by William C. Wilson, General Branch and Development Manager, and John P. McCloskey, Manager for Pulp and Paper Sales. The predecessor of Section XX, the subject of this preliminary trial, was Section XVI of this proposal, which read as follows:

XVI. *LIMITATION OF LIABILITY*

Dravo shall not be liable for any contingent liability or indirect, special or consequential damage including, but not limited to, liability or damage resulting from loss of time in putting the plant, or any unit thereof, in operation, or resulting from delays or loss of time affecting other plants or property of Lincoln Pulp and Paper Corporation, or for loss of profits or products.

Two additional clauses in the August 5 proposal also purported to limit Dravo's liability:

X. *GUARANTEE*

Dravo guarantees the work performed under this proposal against defects in material or workmanship for a period of one year from the date of completion of erection and Dravo will repair, alter, or replace, at its option, any item found to be defective with the exception that any items of machinery and/or equipment supplied to Dravo for incorporation into this project will bear the same guarantee from Dravo Corporation to Lincoln Pulp and Paper Corporation as the supplier gives to Dravo.

Dravo extends no warranties, expressed or implied, other than those set forth in this Paragraph X.

XI. *COMPLETION*

.   .   .   .   .

It is expressly understood and agreed that any completion dates specified are tentative only, and, in the event of delay, Dravo shall not be liable for damages of any kind.

Discussions at the August 6 meeting focused upon price, start-up timing, and financing arrangements. Little was said concerning the limitation of liability clause. Torras testified that he refused to accept the clause because it represented a departure from Dravo's assurances that they could guarantee the job. Wilson testified that Dravo could make no further concessions if Lincoln's price was to be accepted. After telephoning James P. Sharpe, General Manager of Dravo's Engineering-Construc-

---

3. A "process" plant converts raw materials into usable products, normally through a chemical or thermal reaction.

tion ("E & C") Division, and obtaining his approval, Wilson finally agreed to a lower price, stating that Dravo would agree to no more concessions. Lincoln then furnished Dravo a letter of intent, dated August 6, 1970. The letter established a lump-sum price of $5,200,000, an August 15, 1972 target date for completion of the project, and authority for Dravo to place an order for the recovery boiler with Babcock & Wilcox Company. This preliminary agreement was contingent upon Lincoln's ability to arrange satisfactory financing and is described in its final paragraph as a "non-binding" agreement, subject to execution of a formal contract by September 18, 1970. The letter of intent is silent on most of the terms contained in Dravo's August 5 proposal, including the limitation of liability clause.

Following the August 6 meeting, Dravo submitted a revised proposal, dated August 13, 1970. As requested by Lincoln at the August 6 meeting, this proposal added to Dravo's August 5 proposal a detailed performance guarantee and references to pollution control. The above-quoted provisions of Paragraphs X, XI and XVI of the August 5 proposal were repeated without change.

The next contact between the parties occurred on September 14, 1970, when Wilson and McCloskey came to the offices of Lincoln's attorneys, Messrs. Webster and Sheffield, in New York City to discuss the form of the contract with John D. Smyers, Esq., a senior partner in the firm and an officer of Lincoln. Torras could not be present. Dravo's August 13 revised proposal was discussed, but once again little was said concerning the limitation of liability clause. Various modifications and additions relating to other items were agreed upon, and Smyers proposed that Dravo pay for Lincoln's interest costs if start-up was delayed beyond a certain date. It was agreed that Lincoln's attorneys would prepare a draft of the formal contract and submit it to Dravo.

After the September 14 meeting counsel for Lincoln prepared at least six drafts of the proposed formal contract. The final draft, dated October 6, 1970, was forwarded to Dravo under Smyers' covering letter of the same date. In this draft a provision was added to the "Completion" paragraph imposing liability on Dravo for the interest costs of Lincoln's financing if the performance guarantees and representations were not met within a certain time. The draft also deleted the disclaimer of warranties provision from the "Guarantee" paragraph. Additionally, the limitation of liability paragraph was rewritten to assume (except for the last clause) the form found in the final contract:

XX. *LIMITATION OF LIABILITY*

Dravo shall not be liable for any liability or special or consequential damage resulting from loss of time in putting the unit in operation, or resulting from delays or loss of time affecting other plants or property of Lincoln or for loss of profits or products, except as specified in Section XVI hereof.

Smyers' cover letter forwarding the October 6 draft identified most of the substantive changes made by Lincoln including the interest penalty addition to the "Completion" paragraph, but did not mention the deletion of the warranty disclaimer or the changes made in the limitation of liability clause, other than the new cross-reference to Section XVI in the last clause. All witnesses agree that these changes were never discussed between the parties.

Upon receipt of Smyers' draft contract and covering letter, Wilson gave the draft a line-by-line review, underscoring all changes from Dravo's August 13 proposal. On October 14, 1970 McCloskey responded to Smyers' letter, enclosing a copy of the October 6 draft containing Dravo's countersuggestions. McCloskey's letter rejected various substantive changes made in Smyers' draft, including the interest penalty provision. The letter did not, however, comment upon the changes made in the limitation of liability clause or the deletion of the warranty disclaimer.

The parties met again in New York on October 23, 1970. Present at the meeting were Torras, Smyers, McCloskey, Ernest

Carpenter, Esquire, an attorney in Dravo's Patent Department, William Moreland, from the office of Dravo's Treasurer, and Lincoln's bankers. Dravo's October 14 letter was one of the subjects discussed, together with extensive discussions of financing arrangements and related interim commitments by Lincoln to Dravo. Torras and Smyers accepted Dravo's objections to the interest penalty clause, but no substantive changes were made in the limitation of liability clause. By letter dated October 27, 1970 Smyers sent to Dravo a redraft of the October 6 draft contract, omitting the interest penalty provision as Dravo had requested. This draft (still dated October 6) was again reviewed by Wilson and Carpenter to confirm that it reflected the changes agreed upon at the October 23 meeting. After the October 27 redraft no further changes were made in the three protective clauses.

The final contract, dated December 4, 1970, and executed March 9, 1971, omits the above-quoted warranty disclaimer clause from the "Guarantee" paragraph, retains the above-quoted protective sentence in the "Completion" paragraph, and contains the limitation of liability clause as modified by Smyers' October 6 draft (except for the cross-reference to Section XVI).[4]

## II.

### The Law

A. *Preliminary.*

The Court notes two preliminary matters at the outset.

First, this being a diversity of citizenship case, this Court must determine the applicable law as if it were a court of the State of Maine, in which it sits. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61

S.Ct. 1020, 85 L.Ed. 1477 (1941); *Katz v. Gordon Johnson Co.,* 160 F.Supp. 126 (D.Me. 1958). The contract provides that it "shall be construed and enforced in accordance with the law of the Commonwealth of Pennsylvania." Under established principles, a Maine court would honor the contractual choice of law and apply Pennsylvania law in matters of contract interpretation. *Massengale v. Transitron Electronic Corp.,* 385 F.2d 83 (1st Cir. 1967); *Buono Sales, Inc. v. Chrysler Motors Corp.,* 363 F.2d 43, 47 (3d Cir.), *cert. denied,* 385 U.S. 971, 87 S.Ct. 510, 17 L.Ed.2d 435 (1966); Restatement (2d), Conflict of Laws, § 187 (1971). While the parties agree that Pennsylvania law governs the interpretation of Section XX insofar as it applies to Lincoln's breach of contract and breach of warranty claims, Dravo argues that Maine law governs construction of the clause regarding its application to Lincoln's negligence claim. Whether the clause is effective to limit Dravo's liability for damage caused by negligence is, however, clearly a matter of contract interpretation and therefore also governed by Pennsylvania law. *Becker Pretzel Bakeries, Inc. v. Universal Oven Co.,* 279 F.Supp. 893, 899 (D.Md.1968); *Southwest Forest Industries v. Westinghouse Electric Corp.,* 422 F.2d 1013, 1019 n. 6 (9th Cir.), *cert. denied,* 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970); *cf. Potomac Electric Power Co. v. Westinghouse Electric Corp.,* 385 F.Supp. 572, 574 n. 2 (D.D.C.1974), *rev'd and remanded without opinion,* 527 F.2d 853 (D.C.Cir.1975); *Security Ins. Group v. Emery,* 272 A.2d 736 (Me.1971). In any event, the Court has been shown no authority indicating that the substantive law of Pennsylvania differs from that of Maine on this issue, or that Pennsylvania law offends any Maine public policy. *See* Restatement (2d),

---

4. More than two years after the commencement of this action and just prior to trial, Dravo moved to amend its answer to add the affirmative defense of reformation of Section XX of the contract to the language first proposed by Dravo in the August 5, 1970 draft. This motion was denied by the Court on November 19, 1976, subject to renewal at the close of the evidence at the preliminary trial. Dravo failed to renew its motion at that time.

Nevertheless, much of Dravo's evidence at this hearing concerned the lack of awareness of Dravo's negotiators of the changes made in Section XX by Lincoln. The record is replete, however, with indications that Dravo was well aware of the changes made and that Lincoln did not attempt to deliberately mislead Dravo. This evidence should finally put this issue to rest.

*supra,* § 187, comment g; *Cyclops Corp. v. Home Insurance Co.,* 389 F.Supp. 476, 480 (W.D.Pa.), *aff'd,* 523 F.2d 1050 (3d Cir. 1975); *U.S. Fibres v. Proctor & Schwartz,* 358 F.Supp. 449, 456 (E.D.Mich.1972), *aff'd in part,* 509 F.2d 1043 (6th Cir. 1975). *Cf. American Electric Power Co. v. Westinghouse Electric Corp.,* 418 F.Supp. 435, 455 n. 36 (S.D.N.Y.1976).[5]

■ Second, since Dravo asserts the limitation of liability clause as an affirmative defense, Pennsylvania law requires that it bear the burden of proof. *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1219 (3d Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

B. *The Limitation of Liability Clause Relieves Dravo of Liability for Consequential Damages, Including Loss of Profits and Products, Arising From Breach of Contract or Breach of Warranty.*

The limitation of liability clause (Section XX) in the Lincoln-Dravo contract reads as follows:

> Dravo shall not be liable for any liability or special or consequential damage resulting from loss of time in putting the Unit in operation, or resulting from delays or loss of time affecting other plants or property of Lincoln or for loss of profits or products.

■ As the parties agree, this Court must ascertain the intention of the parties as expressed by the text of Section XX when read against the background of the negotiations leading to the contract and the applicable law. Application of these principles compels the conclusion that the clause must be construed as shielding Dravo from liability for consequential damages, including loss of profits and products, arising from breach of contract or breach of warranty.

■ (1) Under well-established canons of contractual interpretation, the plain language of the contract controls where no ambiguity is present, and courts may not rewrite contracts, particularly commercial agreements arrived at following lengthy negotiations between two corporations of equal bargaining strength. *Hagarty v. William Akers, Jr., Co.,* 342 Pa. 236, 20 A.2d 317 (1941), *cited with approval in Robert F. Felte, Inc. v. White,* 451 Pa. 137, 302 A.2d 347, 351 (1973).

Even without reference to the history of the negotiations, the Court is persuaded that Section XX is unambiguous and susceptible of only one interpretation. Its own internal grammar requires parsing the clause to read:

> Dravo shall not be liable
> [1] for any liability or special or consequential damage
>> [a] resulting from loss of time in putting the Unit in operation, or
>> [b] resulting from delays or loss of time affecting other plants or property of Lincoln or
> [2] for loss of profits or products.

The parallelism is required by the second "for," which is otherwise not accounted for. Even if this second "for" were disregarded, the clause would read "Dravo shall not be liable for . . . loss of profits or products." Although pressed by the Court, Smyers, counsel for Lincoln throughout the contract negotiations, could provide no grammatical rationalization for Lincoln's interpretation of the clause.

■ Lincoln's sole legal argument is that "the specific governs the general," and therefore the final broad exclusion of liability for "loss of profits or products" must be read in the context of, and be limited by, the specifically mentioned delays in start-up preceding the final phrase. This analysis must be rejected for several reasons. First, the second element of Section XX refers to "delays or loss of time affecting other plants or property of Lincoln." Only the first element—"loss of time in putting the Unit in operation"—refers to delays in start-up. The second element is not re-

---

5. The parties agree that Maine law will govern the substantive determination of negligence.

That issue, however, is not presently before the Court.

stricted to delays in start-up; in terms it encompasses any delays or loss of time which affect other plants or property of Lincoln, which would include delays in obtaining desired production levels or loss of production time. Second, Lincoln admits that loss of profits or products is merely one form of consequential damage. As all consequential damage resulting from delays or loss of time is clearly precluded by the initial two elements of Section XX, reading the third element—"loss of profits or products"—as limited to losses caused by "delays" or "loss of time" would make the third element wholly redundant. A court must attempt to give effect to *all* provisions of a contract. *Robert F. Felte, Inc. v. White, supra.*[6] Finally, the principle cited by Lincoln is a secondary rule of construction, to be applied only if 1) a contract is ambiguous, 2) the intent of the parties cannot be ascertained by taking all the circumstances of the transaction into account, and 3) there are inconsistent and conflicting contractual provisions. Restatement of Contracts, § 236(c) at 327–28; 3 Corbin on Contracts, § 547 at 172–78. None of these conditions are present on this record.[7]

(2) When Lincoln's counsel, Smyers, redrafted the contract prior to submission of the October 6 draft, several textual changes were made in Section XX, including the deletion of both the final comma in Dravo's initial draft and the expansive phrase "in-

cluding, but not limited to."[8] Prior to trial Lincoln contended that the elimination of the comma was to clarify its own understanding that the final phrase did not add substantively to the meaning of the section. The evidence adduced at trial, however, clearly showed that the deletion of this comma was inadvertent and mere happenstance, occurring when, in Smyers' first draft, "Lincoln Pulp and Paper Corporation," was shortened to "Lincoln," a defined term. Smyers admitted that he did not even examine the clause carefully until the more substantive deletion of the phrase "including, but not limited to," which was not made until September 30, five drafts after the comma had been excised. His avowed purpose in the later changes was to limit the scope of the clause. This explanation does not alter, however, the starkness of the clause's final phrase: "or for loss of profits or products."

(3) Even if an ambiguity were discerned in the text of Section XX, the language of an ambiguous contract is construed against the draftsman. *United Vending Corp. v. Lacas,* 410 Pa. 614, 190 A.2d 298, 300 (1963). While Dravo's proposal of August 5, 1970 contained the original draft of the limitation of liability clause, it is undisputed that Lincoln's counsel, Smyers, an experienced and skilled attorney, drafted the clause in its present form.

---

**6.** Moreover, Section XV of the contract expressly states that "Dravo shall not be liable for damages of any kind" for failure to meet the agreed upon completion date for the Unit. While not interpreting the scope of Section XV, this prior explicit reference to liability for delays in start-up is one more indication that Section XX must be read more broadly than plaintiff's interpretation permits.

**7.** The cases cited by Lincoln do not call for the application of the principle that "the specific governs the general" to this case. All were concerned with dissimilar contractual language and factual situations inapposite to the interpretation of Section XX. *See Neal D. Ivey Co. v. Franklin Associates,* 370 Pa. 225, 87 A.2d 236 (1952); *City of Philadelphia v. Philadelphia Transportation Co.,* 345 Pa. 244, 26 A.2d 909 (1942); *Pennsylvania Turnpike Comm'n v. United States Fidelity & Guaranty Co.,* 343 Pa. 543, 23 A.2d 416 (1942); *In Re Alloy Mfg. Co.*

*v. Employees Trust,* 411 Pa. 492, 192 A.2d 394 (1963); *Faltin Motor Transp. Inc. v. Eazor Express, Inc.,* 273 F.2d 444 (3d Cir. 1959); *Affiliated Food Distributors v. Local Union No. 229,* 483 F.2d 418 (3d Cir. 1973), *cert. denied,* 415 U.S. 916, 94 S.Ct. 1412, 39 L.Ed.2d 470 (1974); *Badgett Mine Stripping Corp. v. Pennsylvania Turnpike Comm'n,* 173 F.Supp. 425 (M.D.Pa. 1959).

**8.** The italicized terms were deleted in Smyers' rewrite of Section XX:

Dravo shall not be liable for any *contingent* liability or *indirect,* special or consequential damage *including, but not limited to, liability or damage* resulting from loss of time in putting the *plant, or any* unit *thereof,* in operation, or resulting from delays or loss of time affecting other plants or property of Lincoln *Pulp and Paper Corporation,* or for loss of profits or products.

An intent to narrow the scope of the clause could easily have been accomplished by simply stating that "Dravo shall not be liable for special or consequential damage, including loss of profits or products, resulting from . . . ." If an ambiguity were present, the Court would arrive at the same conclusion as to the interpretation of the language of Section XX.

(4) The record of the contract negotiations plainly shows that Lincoln understood the broad scope of Section XX. As noted above, if Smyers had intended to limit the clause to damages caused by delay in start-up, he certainly could have expressed himself more clearly. In addition, Smyers' request for interest payments in the event of a delay in meeting performance guarantees and Dravo's refusal of such a liability clearly show the pattern of risk apportionment ultimately agreed upon between the parties. If Dravo could not accept even so limited a form of consequential damages as the interest penalty, Lincoln could not have believed that Dravo had accepted a far more drastic curtailment of its limitation of liability clause to only such consequential damages as resulted from delay in start-up. Indeed, Smyers' advice to Torras during the negotiations shows his understanding that the limitation clause was broadly applicable. Smyers explained that the deletion of the interest penalty provision was of "major importance" and that reliance upon Dravo's good faith in meeting the agreed-upon completion date would leave Lincoln "with no legal protection."

(5) The pattern of risk apportionment reflected in the negotiations referred to above is also supported by the trade usage testimony of Philip F. Lyon, qualified as an expert in the engineering and construction industry. He stated that no contingency is contained in price estimates for E & C contracts for risk of loss of profits or products; that only an explicit provision, such as a liquidated damages clause for nonperformance, might shift the risks acknowledged within the industry; and that owners customarily assume the risk of loss of opportunity for profits due to delay and the engineer-constructor assumes the obligation to repair or replace the plant to meet contract specifications. He also testified that limitation of liability clauses became standard in the industry by the late 1960s, resulting from both the rise in litigation in this area and the inclusion of limiting clauses in the equipment contracts of suppliers. He further testified that E & C limitation clauses generally cover consequential damages in three areas: 1) delays in putting the plant into operation; 2) adverse effects on other property or plants of the owner; and 3) loss of production or profits by the owner. The record discloses that Dravo reflected these changes in industry practice, creating its own "standard clause," which was incorporated in every engineering-construction contract entered into after February 1970. The precise language of the clause was, however, subject to negotiation.

In light of the foregoing, the Court holds that the clear intent of the parties in Section XX of their contract was to relieve Dravo of liability for consequential damages, including loss of profits and products, resulting from breach of contract or breach of warranty. Since Pennsylvania courts will enforce limitation of liability clauses according to their terms, *National Cash Register Co. v. Modern Transfer Co.,* 224 Pa.Super. 138, 302 A.2d 486 (1973); *Magar v. Lifetime, Inc.,* 187 Pa.Super. 143, 144 A.2d 747 (1958), Dravo has carried its burden of proof on this issue.

C. *The Limitation of Liability Clause Does Not Shield Dravo From Liability For Consequential Damages, Including Loss of Profits and Products, Resulting From Its Own Negligence.*

As stated above, the law of Pennsylvania, chosen by the parties, controls the question whether the limitation of liability clause (Section XX) in the Lincoln-Dravo contract protects Dravo from the consequences of its own negligence. As also previously noted, for the purposes of the determination of this question, the Court must assume that Lincoln is able to establish negligence on the part of Dravo as alleged in Count III of the complaint—spe-

cifically, that Dravo was negligent: "(1) in failing to furnish and exercise appropriate design, engineering and managerial skill in designing the Unit; (2) in preparing and recommending improper Specifications; (3) in constructing and later in repairing and replacing parts of the Unit improperly; and (4) in obtaining and installing inadequate and inefficient equipment unsuitable for intended purposes." Application of the standards established by Pennsylvania law compels the conclusion that Section XX is not effective to relieve Dravo from liability for consequential damages arising from its own negligence.

■ At the outset, it may be noted that under Pennsylvania law private parties may validly contract to relieve themselves from the consequences of negligent acts. *Dilks v. Flohr Chevrolet*, 411 Pa. 425, 192 A.2d 682, 687 (1963); *Employers Liability Assurance Corp. v. Greenville Business Men's Ass'n*, 423 Pa. 288, 224 A.2d 620, 622–23 (1966); *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1216 (3d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).[9] The law of Pennsylvania, however, requires a "clear and unequivocal" expression of intent to limit liability for negligence:

> [W]here a person claims that, under the provisions and terms of a contract, he is rendered immune from and relieved of any liability for negligent conduct on his part or on the part of his employees, the burden is upon such person to prove (a) that such contractual provisions and terms do not contravene public policy and (b) that the provisions and terms of the contract *clearly* and *unequivocally* spell out the *intent* to grant such immunity and relief from liability. Absent such proof, the claim of immunity fails.

*Dilks, supra*, 192 A.2d at 688 (emphasis in original).

Pennsylvania law further establishes that " 'contracts against liability for negligence are not favored by the law', and will be construed strictly, with every doubt resolved against the party seeking their protection. . . . This is particularly so where such party has drafted the contract." *Neville Chemical, supra*, at 1216–17 (citations omitted); *see Gimbel Brothers, Inc. v. Vanderherchen, Inc.*, 468 F.2d 597, 599 (3d Cir. 1972). *Employers Liability, supra*, announced the following standards for interpretation:

> (1) contracts providing for immunity from liability for negligence must be construed strictly since they are not favorites of the law; (2) such contracts "must spell out the intention of the parties with the greatest of particularity" and show the intent to release from liability "beyond doubt by express stipulation" and "[n]o inference from words of general import can establish it"; (3) such contracts must be construed with every intendment against the party who seeks the immunity from liability; (4) the burden to establish immunity from liability is upon the party who asserts such immunity.

224 A.2d at 623 (citations omitted).

The parties agree that Dravo's liability for consequential damages arising from negligence was never discussed during the preliminary contract negotiations. The Court must therefore ascertain their intent as to the scope of Section XX solely from the language of the clause. In the present case, Section XX lacks any expression of a "clear and unequivocal" intent to relieve Dravo from liability for consequential damages caused by its own negligence. As in *Neville Chemical, supra*, the clause "does not include the word negligence or any of its cognates and is essentially a clause of 'general import'," *id.* at 1220,[10] and it is well

---

**9.** In order to be valid, however, Pennsylvania law requires that three conditions be met: (1) no public policy of the State is violated; (2) the contract is between persons relating entirely to their own private affairs; and (3) each party is a free bargaining agent and the contract is not one of adhesion. *Employers Liability, supra,*

224 A.2d at 622–23. All three conditions are met in this case.

**10.** Lincoln argues that to be effective against a negligence claim a general disclaimer must specifically include the word "negligence" or one of its cognates. It is true that since *Dilks*, no

established under Pennsylvania law that a general disclaimer of liability is ineffective to exclude liability for negligence. *Neville Chemical Co. v. Union Carbide Corp., supra; Employers Liability Assurance Corp. v. Greenville Business Men's Ass'n, supra; Keystone Aeronautics Corp. v. R. J. Enstrom Corp.*, 499 F.2d 146, 150 (3d Cir. 1974); *Dilks v. Flohr Chevrolet, supra; Perry v. Payne*, 217 Pa. 252, 66 A. 553, 555–57 (1907). *See Ebasco Services Inc. v. Pennsylvania Power & Light Co.*, 402 F.Supp. 421, 429 (E.D.Pa.1975); *cf. Posttape Associates v. Eastman Kodak Co.*, 537 F.2d 751 (3d Cir. 1976).

Dravo points to an earlier line of Pennsylvania cases, which found general disclaimers not containing a specific reference to negligence sufficient to bar recovery on negligence claims. *Bryans v. Gallagher*, 407 Pa. 142, 178 A.2d 766 (1962); *Tidewater Field Warehouses, Inc. v. Fred Whitaker Co.*, 370 Pa. 538, 88 A.2d 796 (1952); *Bogutz v. Margolin*, 392 Pa. 151, 139 A.2d 649 (1958); *Manius v. Housing Authority*, 350 Pa. 512, 39 A.2d 614 (1944); *Cannon v. Bresch*, 307 Pa. 31, 160 A. 595 (1932); *Wright v. Sterling Land Co.*, 157 Pa.Super. 625, 43 A.2d 614 (1945); *Shafer v. Reo Motors*, 205 F.2d 685 (3d Cir. 1953); *Charles Lachman Co. v. Hercules Powder Co.*, 79 F.Supp. 206 (E.D.Pa.1948). These cases, however, were decided before *Dilks*, the modern leading case in Pennsylvania which first promulgated the "clear and unequivocal" rule. Moreover, *Cannon, Shafer* and *Lachman* were all specifically discussed in

*Neville Chemical* and were not followed. 422 F.2d at 1218.

Dravo also has asked this Court to follow *Southwest Forest Industries v. Westinghouse Electric Corp.*, 422 F.2d 1013 (9th Cir.), *cert. denied*, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970), and *United States Fibres v. Proctor & Schwartz*, 358 F.Supp. 449 (E.D.Mich.1972), *aff'd in part*, 509 F.2d 1043 (6th Cir. 1975). The holdings of these two courts, however, are contrary to the clear teachings of Pennsylvania law. As the Seventh Circuit in *Berwind v. Litton Industries*, 532 F.2d 1, 6 n. 14 (7th Cir. 1976) stated:

> In *Southwest Forest* . . . the Ninth Circuit, also applying Pennsylvania law, came to the opposite conclusion of the *Neville* court, holding that "Westinghouse shall not be liable for consequential damages" precluded full negligence liability. However, whereas the Third Circuit opinion carefully analyzed the law of Pennsylvania, one of the states in its circuit, the Ninth Circuit opinion merely string-cited Pennsylvania decisions in support of general construction principles, and is not persuasive.

*United States Fibres* simply relied on *Southwest Forest* without discussion.

Dravo's reliance on *Gates Rubber Co. v. USM Corp.*, 508 F.2d 603 (7th Cir. 1975); *Boone Valley Cooperative Processing Ass'n v. French Oil Mill Machinery Co.*, 383 F.Supp. 606 (N.D.Iowa 1974); and *McTighe v. New England Telephone & Telegraph*

state or federal court in Pennsylvania has held a limitation of liability clause effective to limit recovery for negligence that has not mentioned "negligence", "tort" or a similar term. *See, e. g., American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435 (S.D.N.Y. 1976); *Ebasco Services Inc. v. Pennsylvania Power & Light Co.*, 402 F.Supp. 421 (E.D.Pa. 1975); *Potomac Electric Power Co. v. Westinghouse Electric Corp.*, 385 F.Supp. 572 (D.D.C. 1974), *reversed and remanded without opinion*, 527 F.2d 853 (D.C.Cir.1975); *cf. Warren City Lines Inc. v. United Refining Co.*, 220 Pa.Super. 308, 287 A.2d 149 (1971); *Schroeder v. Gulf Refining Co.* (No. 2), 300 Pa. 405, 150 A. 665 (1930). On the other hand, no Pennsylvania case has held that a specific reference to "negligence" or a cognate is necessary in order to

disclaim negligence liability. The most that can be said is that a specific reference to "negligence" or a cognate, or the absence of such a reference, is a significant factor in determining whether a limitation clause clearly and unequivocally excludes liability for damages arising from negligence. *See, e. g., Morton v. Borough of Ambridge*, 375 Pa. 630, 101 A.2d 661, 663 (1954); *Dilks v. Flohr Chevrolet, supra*, 192 A.2d at 687; *Westinghouse Electric Co. v. Murphy Inc.*, 425 Pa. 166, 228 A.2d 656, 660 (1967); *Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 341 A.2d 174 (1975); *Neville Chemical Co. v. Union Carbine Corp., supra; Gimbel Brothers Inc. v. Vanderherchen, Inc., supra* at 599; *Norfolk & Western Railway Co. v. Hardinger Transfer Co.*, 415 F.Supp. 507, 510–11 (W.D.Pa.1976).

*Co.*, 216 F.2d 26 (2d Cir. 1954) is also misplaced. *Gates* and *Boone Valley* applied Illinois and Iowa law, respectively. Illinois and Iowa impose a far more lenient standard than the law of Pennsylvania. *McTighe* is patently inapposite. It held only that it is not against public policy for a telephone company, even though a public utility, specifically to limit recovery of damages resulting from errors in directory listings.

Finally, Dravo argues that Section XX is a limitation of liability clause, purporting merely to limit Dravo's liability for one particular form of damages, and that it is not an exculpatory clause, purporting to disclaim liability for all damages resulting from negligence. Dravo contends that the above-cited Pennsylvania cases involved exculpatory clauses and that limitation of liability clauses are subject to less stringent rules of construction than exculpatory clauses. *See Posttape Associates v. Eastman Kodak Co., supra* at 755; *Cyclops Corp. v. Home Life Insurance Co.*, 389 F.Supp. 476 (W.D.Pa.), *aff'd*, 523 F.2d 1050 (3d Cir. 1975) (applying Ohio law). Of the cases applying Pennsylvania law, however, only *Posttape Associates* makes this distinction. While *Posttape Associates* could "find no Pennsylvania cases which delineate the requirements necessary to establish an agreement for limitation of damages caused by negligence," the court concluded that "[p]resumably in most cases the same rules should apply as in the exculpatory clause situation." *Idem.*

Being satisfied that the limitation of liability clause (Section XX) in the Lincoln-Dravo contract does not meet the "clear and unequivocal" standard of Pennsylvania law, the Court holds that it does not shield Dravo from liability for consequential damages, including loss of profits and products, resulting from its own negligence.[11]

D. *The Limitation of Liability Clause Relieves Dravo from Liability for Consequential Damages, Including Loss of Profits and Products, Arising from Breach of Contract or Breach of Warranty, even if Dravo is Found to Have Breached its Contractual Obligation to Repair or Replace Defective Equipment.*

The "Guarantee" clause (Section XI) in the Lincoln-Dravo contract reads as follows:

Dravo guarantees the work performed under this Agreement against defects in material and workmanship for a period of one year from the date on which the Unit meets the tests provided for in Section XII D or, if any piece of equipment is operated prior to such date, for a period of one year from the date on which such operation begins, and *Dravo will repair, alter, or replace, at its option, any item found to be defective* provided, however, that any items of machinery and/or equipment supplied to Dravo for incorporation into the Unit will bear the same guarantee, whether more or less than one year, from Dravo to Lincoln, as the supplier gives to Dravo. (emphasis supplied)[12]

---

11. Philip F. Lyon, defendant's expert witness on trade usage and practice, *see, e. g., Keystone Aeronautics Corp. v. R. J. Enstrom Corp., supra* at 150; *Posttape Associates v. Eastman Kodak Co., supra* at 756; testified that certain errors and omissions are always within the contemplation of the parties to an engineering and construction contract and may occur in nearly half such jobs. Lincoln admits in its brief that certain design and construction errors do not constitute the "negligence" alleged in the complaint. Such errors and omissions were certainly within the contemplation of the parties, even if not verbalized, at the time the contract was executed; clearly, they are not

the negligent design, construction and repair alleged in Count III of the complaint.

12. In addition, Paragraph D of Section XII, which contains the performance guarantees for the recovery boiler, provides in relevant part:

In case of failure to meet performance guarantees, Dravo reserves the right to change or replace the equipment furnished so that guaranteed performance will be obtained. Such changes will be made on a straight time basis without adjustment of the Contract Price and the procedure specified above for determining whether or not the representations and guarantees have been met shall apply after such change or replacement.

Lincoln contends that if Dravo is found to have breached this contractual obligation to repair or replace defective equipment, Dravo will lose whatever protection the limitation of liability clause (Section XX) might otherwise have afforded.

Lincoln's argument is premised upon Section 2–719(2) of the Uniform Commercial Code (UCC),[13] which provides that:

Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

It is Lincoln's position that the Lincoln-Dravo contract is governed by the UCC; that Dravo's obligation to repair or replace defective equipment is "an exclusive or limited remedy" under Section 2–719(2); and that if, as must be assumed for purposes of this preliminary proceeding, Dravo has failed to correct the defects in the system, Section 2–719(2) permits recourse to the full panoply of the Code's remedies, including the recovery of consequential damages pursuant to UCC §§ 2–714 and 2–715, despite the exclusion of such damages by Section XX of the contract. The Court must disagree for three reasons: (1) Article 2 of the UCC does not govern the Lincoln-Dravo contract; (2) even if Article 2 of the UCC is applicable to the contract, Dravo's obligation to repair or replace defective equipment is not "an exclusive or limited remedy" under Section 2–719(2); and (3) even if Dravo's obligation to repair or replace defective equipment might be considered an "exclusive or limited remedy," Lincoln cannot rely on Section 2–719(2) to deny Dravo the protection of the limitation of liability clause.

■ (1) *Applicability of the UCC.* Article 2 of the UCC applies only to "transactions in goods." § 2–102.[14] A contract which is predominantly for the rendition of services, even though it involves the fur-

nishing of equipment, is not a "transaction in goods" and is therefore not governed by Article 2. *E. g., Field v. Golden Triangle Broadcasting, Inc.,* 451 Pa. 410, 305 A.2d 689, 696 (1973), *cert. denied,* 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974); *DeMatteo v. White,* 233 Pa.Super. 339, 336 A.2d 355 (1975); *Schenectady Steel Co. v. Bruno Trimpoli General Construction Co.,* 43 App. Div.2d 234, 350 N.Y.S.2d 920 (Sup.Ct.), *aff'd on other grounds,* 34 N.Y.2d 939, 359 N.Y.S.2d 560, 316 N.E.2d 875 (1974). *See* White & Summers, *Uniform Commercial Code* (1972) § 2–2 at 44.

■ The Lincoln-Dravo contract covers the "engineering and construction of a heat and chemical recovery unit." Dravo agreed "to furnish project management, process and design engineering, procurement, construction management, start-up assistance and materials as well as auxiliary equipment including evaporators and precipitators and construction of a chemical recovery boiler . . . ." The contract was for a fixed fee of $5.2 million, without any allocation of price breakdown between engineering or other services and material costs.[15] The contract is a typical engineering-construction contract involving predominantly the rendition of services, not the sale of goods. As such, it falls outside the scope of Article 2. *See Field v. Golden Triangle Broadcasting, Inc., supra* (sale of businesses of two radio stations); *DeMatteo v. White, supra* (contract for construction of homes); *Schenectady Steel Co. v. Bruno Trimpoli General Construction Co., supra* (furnishing and erection of steel structure for bridge); *Gulash v. Stylarama, Inc.,* 33 Conn.Sup. 108, 364 A.2d 1221, 1223 (1975) (sale and installation of swimming pool); *York Heating & Ventilating Co. v. Flannery,* 87 Pa.Super. 19, 23–24 (1926) (furnishing and erection of heating system) (Pre-UCC).

**13.** Pennsylvania has adopted the Uniform Commercial Code. *See* Pa.P.S., Title 12A.

**14.** Article 2 defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." § 2–105.

**15.** The evidence discloses that the direct equipment and material cost was less than half of the total $5.2 million contract price.

Lincoln has cited a number of cases in support of its position that the UCC governs the present contract, but, with a single exception, all involved contracts predominantly for the sale of complex or specially designed equipment which were clearly within the scope of Article 2.[16]  See *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572 (7th Cir. 1976) (million gallon water tank); *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir. 1974) (movable pieces of a bowling alley); *Aluminum Co. of America v. Electro Flo Corp.*, 451 F.2d 1115 (10th Cir. 1971) (mobile low voltage electric floor); *Southwest Forest Industries, Inc. v. Westinghouse Electric Corp.*, 422 F.2d 1013 (9th Cir.), *cert. denied*, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970) (turbine generator); *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435 (S.D.N.Y.1976) (steam turbine generator); *Cleveland Lumber Co. v. Proctor & Schwartz, Inc.*, 397 F.Supp. 1088 (N.D.Ga.1975) (drying kiln). Only *County Asphalt Inc. v. Lewis Welding & Engineering Corp.*, 323 F.Supp. 1300 (S.D.N.Y.1970), *aff'd*, 444 F.2d 372 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971), involving a contract for the construction and furnishing of two asphalt plants, deals with a situation similar to that before this Court. The District Court, however, applied the UCC without discussion of its applicability, the point was not raised on appeal, and the jury found that a separate supplemental agreement covered labor, materials and equipment for the erection of the plant. *See* 323 F.Supp. at 1305.

Since the Lincoln-Dravo contract was predominantly for the rendition of services and not for the sale of goods, it is not governed by Article 2 of the Uniform Commercial Code.

■ (2) *Exclusivity of Remedy.* Even if Article 2 of the UCC governs the Lincoln-Dravo contract, Lincoln can rely upon Section 2–719(2) only if it first establishes that the contract actually contains "an exclusive or limited remedy." To meet this requirement, Lincoln points to the above-quoted language of Section XI of the contract, by which Dravo guarantees the work against defects in materials and workmanship for a period of one year and undertakes to repair, alter or replace any item found to be defective. Section XI does not, however, state that Dravo's obligation to repair, alter or replace is an exclusive remedy, nor does it contain any language limiting the remedies available to Lincoln under the contract. Section 2–719 itself provides in subsection (1)(b) that a remedy is exclusive only if the parties expressly agree that it is exclusive.[17] Moreover, "subsection (1)(b) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed." § 2–719, comment 2. *See* White & Summers, *supra*, § 12–9 at 377. Lincoln can point to no language in Section XI, or in any other section of the contract, which states that the obligation to repair, alter or replace is exclusive or which in any way limits Lincoln's recourse against Dravo for breach of contract, breach of warranty or negligence to the repair or replacement of equipment. In sum, the contract simply does not contain an exclusive remedy clause.

---

**16.**  A sale of equipment is not removed from the scope of Article 2 merely because the equipment was specially designed and manufactured before delivery or installed by the supplier. UCC § 2–105.  *See, e. g., American Electric Power Co. v. Westinghouse Electric Corp., supra.*

**17.**  Section 2–719(1) reads in full:

(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

In the absence of an exclusive remedy clause, Lincoln cites no case in which a court has applied Section 2–719(2) in the manner here advocated by Lincoln. The cases upon which Lincoln does rely are plainly inapposite, as the contract in issue in each case contained an express exclusive remedy. *See Adams v. J. I. Case Co.,* 125 Ill.App.2d 388, 261 N.E.2d 1 (4th Dist. 1970); *Jones & McKnight Corp. v. Birdsboro Corp.,* 320 F.Supp. 39 (N.D.Ill.1970); *U.S. Fibres, Inc. v. Proctor & Schwartz,* 358 F.Supp. 449, 456 (E.D.Mich.1972), *aff'd in part,* 509 F.2d 1043 (6th Cir. 1975); *Koehring Co. v. A. P. I., Inc.,* 369 F.Supp. 882, 885 (E.D.Mich. 1974); *Soo Line Railroad Co. v. Fruehauf Corp.,* 547 F.2d 1365, 1369–74 (8th Cir. 1977); *Kohlenberger, Inc. v. Tyson's Foods, Inc.,* 256 Ark. 584, 510 S.W.2d 555, 563 (1974); *Ehlers v. Chrysler Motor Corp.,* 226 N.W.2d 157 (S.D.1975).

Even if the Lincoln-Dravo contract is governed by the UCC, Lincoln cannot benefit from Section 2–719(2) because the contract does not contain "an exclusive or limited remedy." [18]

(3) *Continued Effectiveness of Section XX.* Even if Article 2 of the UCC governs the Lincoln-Dravo contract and Dravo's obligation to repair or replace defective equipment constitutes "an exclusive or limited remedy" pursuant to Section 2–719(2), there are at least two additional reasons why

Lincoln cannot rely upon that section to deny Dravo the protection of the limitation of liability clause (Section XX) in the contract:

(a) Official Comment 1 to Section 2–719 of the UCC states that the purpose of Section 2–719(2) is to insure that at least "minimum adequate remedies" and "a fair quantum of remedy for breach of the obligations or duties outlined in the contract" will be available to an injured party.[19] In the present case, unlike the cases cited by Lincoln, *supra,* Dravo has admitted liability for any proven direct damages, and only attempts to limit the recovery of consequential damages. At a minimum, therefore, if a breach of Dravo's obligation to repair or replace is established at trial, Lincoln may recover the cost of correction, which it has estimated to be in excess of $3.5 million. Additionally, pursuant to this Court's determination, *supra,* that Section XX does not shield Dravo from liability for consequential damages resulting from its own negligence, Lincoln may recover consequential damages, including loss of profits and products, if Dravo's negligence is established. Since Lincoln clearly has recourse to substantial damages under the terms of the contract, this is not a case where Dravo's failure to repair or replace, if proven, would leave Lincoln without "minimum ad-

---

**18.** Lincoln attempts to categorize the testimony of Dravo's witnesses as supporting an understanding by the parties that the obligation to repair or replace was to be Lincoln's exclusive remedy for breach of contract, breach of warranty or negligence. The record discloses, however, that the testimony upon which Lincoln relies refers only to Dravo's "obligation" to repair or replace, not to the "remedy" of repair or replacement. There exists a well-recognized distinction between an obligation or guarantee and a remedy. *See, e. g.,* White & Summers, *supra,* § 12–12 at 394 n. 197; *Ford Motor Co. v. Reid,* 465 S.W.2d 80 (Ark.1971).

**19.** Official Comment 1 to Section 2–719 provides in full as follows:
*Purposes:*
*1.* Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.

However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

equate remedies." Lincoln is therefore not entitled to the benefits of Section 2–719(2). *American Electric Power Co. v. Westinghouse Electric Corp., supra* at 458–59; *Koehring Co. v. A. P. I., Inc., supra* at 886–87.

(b) In the contracts at issue in the cases upon which Lincoln relies, *supra,* the limitation of liability clause was an integral part of the warranty/remedy provision found to have failed. The Lincoln-Dravo contract, however, like those examined in *American Electric Power Co. v. Westinghouse Electric Corp., supra,* and *County Asphalt, Inc. v. Lewis Welding & Engineering Corp., supra,* sets forth the limitation of consequential damages in an independent contractual clause (Section XX), wholly apart from the guarantee of repair and replacement (Section XI). In such circumstances, the Court is persuaded that the analysis of *American Electric* and *County Asphalt* is properly applied to the contract in this case. As the *American Electric* court stated:

> [T]here is no reason to disturb the consensual allocation of business risk . . . . One provision of that contract contains defendant's warranty to repair or replace defective parts. A totally separate provision expressly limits the defendant's liability such that special or consequential damages may not be recovered. . . .
> [W]here an exclusive remedy (such as a warranty to repair or replace) fails of its essential purpose, it may be ignored, and other clauses in the contract which limit remedies for breach may be left to stand or fall independently of the stricken clause. Since it cannot be said that the Limitation of Liability provision . . is unconscionable it must be given effect.

*Id.* at 458 (citation omitted). *See also County Asphalt Inc. v. Lewis Welding & Engineering Corp., supra,* 323 F.Supp. at 1309; *Potomac Electric Power Co. v. Westinghouse Electric Corp., supra.*

■ UCC § 2–719(3) permits the limitation or exclusion of consequential damages unless the limitation or exclusion is "unconscionable," a situation rarely arising in a commercial context involving parties of equal bargaining power. *American Electric, supra* at 458 n. 41; *K & C Inc. v. Westinghouse Electric Corp.,* 437 Pa. 303, 263 A.2d 390 (1970); White & Summers, *supra* at § 12–11, 384–86. There is no hint of unconscionability in the record of this case. Dravo is therefore entitled to whatever protection Section XX affords even if Dravo is found to have breached its contractual obligation to repair or replace defective equipment.

## III.

### *Conclusion*

In accordance with the foregoing, the Court holds:

(1) That the limitation of liability clause (Section XX) in the Lincoln-Dravo contract protects Dravo from liability for consequential damages, including loss of profits and products, arising from breach of contract or breach of warranty (Counts I and II of the complaint);

(2) That the limitation of liability clause (Section XX) in the Lincoln-Dravo contract does not shield Dravo from liability for consequential damages, including loss of profits and products, resulting from its own negligence (Count III of the complaint); and

(3) That the limitation of liability clause (Section XX) in the Lincoln-Dravo contract is effective to protect Dravo from liability for consequential damages, including loss of profits and products, arising from breach of contract or breach of warranty, even if Dravo is found to have breached its contractual obligation to repair or replace defective equipment.

IT IS SO ORDERED.